9 A.3d 14

**In re ADOPTION/Guardianship OF CADENCE B.**

**No. 21, Sept. Term, 2010.**

Court of Appeals of Maryland.

Nov. 22, 2010.

148

Piedad Gomez, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for petitioner.

Ann M. Sheridan, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief for respondent.

Marsha L. Williams (Legal Aid Bureau, Inc., Hughesville, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, J.

In this case, we must examine whether it is in a child's best interest to remain in foster care in the hopes that she may someday reunite with her natural parent, even though that neglectful parent continues to willfully absent himself from any meaningful contact with the child and the child's current caregivers are willing to provide her a permanent home through adoption. Here, Petitioner appeals from the juvenile court's decision changing his daughter's permanency plan from reunification to "open adoption." Petitioner lost custody of his daughter when she was only four months old, after the Charles County Department of Social Services ("the Department") received reports that the daughter and her half-brother were being neglected. Unfortunately, Petitioner had a history as a neglectful parent, having already lost custody of his other five children on the same grounds. His daughter was adjudged a Child In Need of Assistance ("CINA")[1] and placed into foster care.

Despite Petitioner's expressed desire for reunification with his daughter, he chose to move out-of-state to a home that could not be monitored by the Department and rarely traveled back to this State to take advantage of Department-sponsored visitation. After a year in foster care, the Department and the child's counsel sought to revise her permanency plan to allow adoption by the daughter's foster family, with whom she had clearly bonded. During a hearing to review the daughter's permanency plan, the juvenile court considered all of the requisite statutory factors and decided that changing the

---

1. A Child In Need of Assistance ("CINA") is a "child who requires court intervention because: (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." Md.Code (1974, 2006 Repl.Vol., 2009 Supp.), § 3–801(f) of the Courts and Judicial Proceedings ("CJP") Article.

permanency plan to "open adoption"[2] was in the daughter's best interest. Petitioner appealed to the Court of Special Appeals, and in an unreported opinion, the intermediate court affirmed the juvenile court. He then sought relief in this Court. We granted his Petition for Writ of Certiorari to answer the following question:

> Where Petitioner concededly had a positive and loving relationship with his two-year-old daughter, did the juvenile court err in terminating reunification efforts and implementing a permanency plan of adoption because of the length of time—just over a year—that the child had lived with her foster parents?[3]

For the reasons articulated below, we will deny his requested relief and affirm the decision of the Court of Special Appeals.

## FACTS AND LEGAL PROCEEDINGS

At the heart of this case sits a three-year-old girl, Cadence, who has spent the majority of her life out of the custody and care of her biological parents. Three days before her four-month birthday, the Department received a complaint that Cadence and her seven-year-old half-brother, John, were being neglected by Cadence's parents, Mr. B. and Ms. L. During an interview with a Child Protective Services worker, John described in detail how his parents smoked drugs:

> John observed his mother, Mr. B. and their friend pass around a thing that they were smoking. He described that his parents would put their mouth on one end and smoke would come out of the other end then they would pass it to

---

**2.** Specifically, the judge found, by clear and convincing evidence,

> that it [is] in this child's best interest to move toward permanency and to sever the parental ties legally, although, the idea is for it to be an open adoption. And that way the child will be free to be adopted by the only parents to whom she is fully bonded and who have provided her with a safe, stable, loving home. Not changing the plan is not gonna result in the change of placement. So, rather than delaying permanency for the child this is necessary in order to move towards permanency.

**3.** *See In re Adoption of Cadence B.*, 412 Md. 689, 990 A.2d 1046 (2010).

the next person who would then take the same actions. . . . John advised that he has also seen his parents use a "can" that they would use to smoke. John was able to provide information as to how the drugs were being smoked by describing the type of instrument used to smoke crack. John advised that what they were smoking was not a cigarette since they smoke cigarettes all the time. John advised that he was watching his parents smoke with their friends, however, stated that his parents to not allow him to watch them smoke because they are afraid he will "tell his friends."

John also talked about how his mother and Mr. B. "often [left him] to care for [Cadence] while they walk[ed], several miles away, to obtain their drugs." He reported that the family was "kicked out of the motel when his parent's friend, Cliff . . . told the people in the office that Mr. B. was selling drugs[.]" After its investigation, the Department filed a non-emergency CINA petition in the Charles County juvenile court on September 24, 2007.

Unfortunately, this was not the Department's first encounter with Mr. B. In 2001, the Department removed his two oldest children, J.D. and Davey, from Mr. B.'s care following "concerns [of] . . . [lack] of supervision of the children, home environment, and parental drug use." J.D. and Davey were placed into the custody of Mr. B.'s mother, who resides in Maryland. Mr. B. fathered three other children with Ms. L.—Savanna, Sebastian, and Miranda—and his parental rights to those children were involuntarily terminated in 2008. All three children tested positive at birth for illegal substances, prompting the Department to inquire into their living situation. Each of these investigations produced findings of neglect. At this time, Mr. B. was aware of Ms. L.'s cocaine problem, but did not take steps to remove his children from their dangerous home environment. In fact, Mr. B. attempted to conceal the extent of his children's exposure to drugs by falsifying substance abuse documents and submitting them to the Department.

Five months after the Department filed its petition in this case, the Charles County juvenile court declared Cadence to be a CINA and placed her in the temporary custody of Ms. L. under an Order of Protective Supervision. Ms. L., however, violated that order, leading the Department to place Cadence in the foster home of Mr. and Mrs. Z., where she has remained.[4] Cadence has bonded well with her foster family, "as if they were her biological family." She is "a happy child and appears to be thriving in Mrs. Z.'s care." Mr. and Mrs. Z. give Cadence an opportunity to have regular contact with her siblings and are "willing to continue those relationships with her siblings and with her parents."

Meanwhile, as Cadence was making her way through the juvenile system, Mr. B. was dealing with legal troubles of his own. Three days after Cadence's four-month birthday, Mr. B. surrendered to Charles County law enforcement after he discovered that there was a warrant for his arrest for writing a bad check. He remained incarcerated in Charles County for one month until he was extradited to Pennsylvania to satisfy another arrest warrant for welfare fraud. Following his release from jail in Pennsylvania, Mr. B. chose to remain in that state to live with his new girlfriend and current fiancée, Denise, instead of returning to Maryland where all six of his children reside.[5] His home is currently in Fayette County, Pennsylvania, which is approximately a four to four and a half hour drive from where Cadence lives in Charles County, Maryland. He and Denise share a trailer with two full baths, three bedrooms, a kitchen, living room, and laundry room. Mr. B. pays the mortgage and lot fees for the trailer. He has

4. Cadence began life with Mr. and Mrs. Z. when she was ten months old.

5. At trial, Mr. B. claimed that he moved to Pennsylvania in pursuit of affordable housing. Yet, other than his assertion that living in a comparable place in Maryland would cost "probably over what [he's] paying now[,] ... [p]robably a couple more hundred" dollars a month, he offered no evidence to show that he could not find affordable housing anywhere in Maryland.

also maintained employment [6] and his court-ordered urinalysis results have consistently been negative.

Mr. B. has had irregular and limited contact with Cadence since she has been in foster care.[7] Between the time of his release in Pennsylvania and the juvenile hearing changing Cadence's permanency plan, Mr. B. chose to visit her 11 out of 19 months, or, stated differently, only 18 out of 561 days. The Department has indicated to Mr. B. that he could visit Cadence more frequently and that he could arrange visits directly with Ms. Z. It has even provided him with gas vouchers to facilitate more visits, but to no avail.[8] Mr. B. does, however, send Cadence "cards, letters, gifts, [and] emails[,]" and stays in touch with Cadence's foster mother.

When Mr. B. does visit Cadence, the two interact well. Mr. B. and Cadence have a "[v]ery good, loving[,]" "positive relationship." As reported by one caseworker: "[Mr. B. is] nurturing to [Cadence]. He's playful with her. He's responsive to her needs. The child is responsive to him. She smiles at him. She goes right to him." Mr. B. takes Cadence to the park, to the community center, and to visit Mr. B.'s mother and his two sons who live with her. Although Ms. Z. expressed concern that Cadence does not know Mr. B., she did

---

**6.** Immediately before the lower court hearing in this case, Mr. B. had been laid off from his job, but was actively seeking new employment and had attended a job interview the day before the hearing.

**7.** Mr. B. has not resided with Cadence since she was four months old.

**8.** The Department has not, however, allowed Cadence to visit Mr. B. in Uniontown because the Fayette County Children and Youth Services ("FCCYS") would not certify Mr. B.'s home as placement resource for Cadence. The Department requested that FCCYS conduct a home study of Mr. B's home pursuant to the Interstate Compact for the Placement of Children ("ICPC"), of which Maryland is a member. Under our conforming legislation, the Department was authorized to "enter into an agreement with [the FCCYS] providing for the performance of one or more services in respect of such case by the latter as agent for the [Department]." Md.Code (1999, 2006 Repl.Vol., 2009 Supp.), § 5–606(b) of the Family Law ("FL") Article. FCCYS's refusal to certify Mr. B's home means that FCCYS would not agree to monitor the home to ensure Cadence's safety while there.

not have any safety concerns about Mr. B.'s unsupervised visits with Cadence.

As required by Maryland law, the Charles County juvenile court has monitored the progress of Cadence's reunification with Mr. B. through a series of Permanency Plan Review hearings. The Permanency Plan Review hearing at issue in this case occurred on April 23 and 27, 2009. At its conclusion, the juvenile court changed the permanency plan from reunification to "open adoption,"[9] allowing the family to begin the process of adopting Cadence.[10] The court articulated the following reasoning in its order:

> Mr. B. continues to reside in Pennsylvania. He has chosen to remain in Pennsylvania, despite his family, other five children, and Cadence being in Charles County, Maryland.... Mr. B. has made a new life for himself in Pennsylvania, and he has expressed no plans to return to Maryland on a permanent basis. **Mr. B's choice to absent himself from being available for meaningful, more frequent contact with Cadence has been the biggest impediment to reunification.**
>
> **Open adoption is an appropriate plan, because the parents have a good relationship with Ms. Z., who is willing to facilitate the continued relationship with the parents and abide by any post-adoption agreements reached.** Because of the exceptional circumstances which exist; due to the child's being in the Z. home for a significant part of her life; and the bond that exists between the

---

9. An "open adoption" is "an adoption in which it is the explicit intent of all parties to the adoption that the child maintain contact, including the possibility of visitation, with the birth parents or other birth relatives[.]" MD.CODE REGS. 07.02.12.02(B)(29) (2010). Maryland regulations permit the Department to "explore" open adoption when "(1) [o]lder children who are placed in out-of-home care know who their birth parents are and have already formed significant emotional attachments to them; and (2)[i]t is otherwise appropriate and in the child's best interest not to sever all ties with the child's birth parents or relatives." MD.CODE REGS. 07.02.12.12–1 (2010).

10. Ms. L. consented to the Z.'s adoption of Cadence.

child and the Z. family, the Court finds that it is in the child's best interest to move toward permanency and to sever the parental tie legally, so that the child can be adopted by the Z.s to whom she is bonded.

(Emphasis added).

Mr. B. appealed the juvenile court's decision to the Court of Special Appeals, and in an unreported opinion, that Court affirmed the juvenile court. Mr. B. then filed a Petition for Writ of Certiorari, which this Court granted.

## DISCUSSION

### A. Standard of Review

In child custody disputes, Maryland appellate courts apply three different but interrelated standards of review:

When the appellate court scrutinizes factual findings, the clearly erroneous standard ... applies. [Secondly,] if it appears that the [juvenile court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [juvenile court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [juvenile court's] decision should be disturbed only if there has been a clear abuse of discretion.

*In re Yve S.*, 373 Md. 551, 586, 819 A.2d 1030, 1051 (2003). In this case, Mr. B. challenges the juvenile court's ultimate decision rather than any findings of fact. Thus, we must determine whether that court abused its discretion. In doing so, we are mindful that

[q]uestions within the discretion of the trial court are much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred. In sum, to be reversed the decision under consideration has to be well removed from any center mark imagined by the reviewing

court and beyond the fringe of what that court deems minimally acceptable.

*Id.* at 583–84, 819 A.2d at 1049 (internal quotations omitted).

## B. Analysis

 In CINA cases where a child had been removed from the family home, a juvenile court is required to conduct "a permanency planning hearing to determine the permanency plan for a child." Md.Code (1974, 2006 Repl.Vol., 2009 Supp.), § 3–823(b) of the Courts and Judicial Proceedings ("CJP") Article. As we stated in *Yves,*

> The permanency plan is an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement.... Services to be provided by the local social service department and commitments that must be made by the parents and children are determined by the permanency plan.

373 Md. at 581, 819 A.2d at 1048. It is the court's "responsibility [to] determin[e] the permanency plan, ... and [to] justify[ ] the placement of children in out of home placements for a specified period or on a long-term or permanent basis...." *Id.* at 577, 819 A.2d at 1046.

 At the hearing, the court must consider the following factors:

(i) the child's ability to be safe and healthy in the home of the child's parent;

(ii) the child's attachment and emotional ties to the child's natural parents and siblings;

(iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;

(iv) the length of time the child has resided with the current caregiver;

(v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and

(vi) the potential harm to the child by remaining in State custody for an excessive period of time.

Md.Code (1999, 2006 Repl.Vol., 2009 Supp.), § 5–525(f)(1) of the Family Law ("FL") Article. Reunification with the parent is presumptively the better option, and, absent compelling circumstances to the contrary, the plan should be to work towards reunification as it is presumed that "it is in the best interest of the children to remain in the care and custody of their [biological] parent[ ]." *In re Adoption/Guardianship of Rashawn H. and Tyrese H.*, 402 Md. 477, 495, 937 A.2d 177, 188 (2007). Nevertheless, that course must be "consistent with the best interests of the child[.]" CJP § 3–823(e)(1)(i). Thus, if there are weighty circumstances indicating that reunification with the parent is not in the child's best interest, the court should modify the permanency plan to a more appropriate arrangement. *See Rashawn*, 402 Md. at 496, 937 A.2d at 189. ("[W]here the fundamental right of parents to raise their children stands in the starkest contrast to the State's effort to protect those children from unacceptable neglect or abuse, the best interest of the child remains the ultimate governing standard.") In other words, the child's best interest remains the "transcendent standard in adoption, third-party custody cases, and TPR proceedings." *In re Adoption/Guardianship of Ta'Niya C.*, 417 Md. 90, 8 A.3d 745 (2010). *See also In re Shirley B.*, 191 Md.App. 678, 707, 993 A.2d 675, 692 (2010) ("In developing a permanency plan, the 'best interests of the child' are the primary consideration.").

■■ Additionally, in custody and TPR cases, where there is a proven history of abuse or neglect, "the proper issue before the hearing judge [is] whether there was sufficient evidence that further abuse or neglect [is] unlikely." *Yve S.*, 373 Md. at 593, 819 A.2d at 1055; *see also* FL § 9–101(b) ("Unless the court specifically finds that there is no likelihood of further child abuse or neglect by [the parent], the court shall deny custody or visitation rights to that party[.]"). The previously abusive or neglectful parent shoulders the burden of proving that the past conduct will not likely be repeated. *See Yve S.*, 373 Md. at 587, 819 A.2d at 1052 ("The burden is

on the parent previously having been found to have abused or neglected his or her child to adduce evidence and persuade the court to make the requisite finding under [Section] 9–101(b).")." Yet, "even upon substantial evidence of past abuse or neglect, [Section 9–101] does not require a finding that future abuse or neglect is impossible or will, in fact, never occur, but only that there is no likelihood—no probability—of its recurrence." *In re Adoption No. 12612*, 353 Md. 209, 238, 725 A.2d 1037, 1051 (1999).

Mr. B. contends that the juvenile court in this case erred because, "[i]n focusing on the child's time in foster care, [it] misapplied the best interest of the child standard."[11] He attempts to analogize this case to those in which this Court has held that the juvenile court erroneously concentrated on the length of time the child was separated from the parent rather than considering all of the requisite statutory factors. According to Mr. B., "there was no evidence presented to

---

11. In a footnote, Mr. B. also hints that his efforts for reunification were improperly thwarted by the Interstate Compact on the Placement of Children ("ICPC") because of Fayette County's refusal to certify his home. He argues that the ICPC requirements should never have factored into this case because the ICPC does not govern situations where "a child is left in the receiving state with [her] parent." For support, Mr. B. cites the language of FL Section 5–609, the law governing the ICPC:

This compact shall not apply to:
(1) the sending or bringing of a child into a receiving state by the child's parent, step-parent, grandparent, adult brother or sister, adult uncle or aunt, or guardian and leaving the child with any such relative or non-agency guardian in the receiving state.

Mr. B.'s interpretation, however, is inconsistent with the plain language of the statute. We agree with the Court of Special Appeals that "in order for this exception to apply, 1) the child must be brought or sent to the receiving state by any of the aforementioned relatives or guardian; *and* 2) the child must be left with any such relative." (emphasis in original). Here, Cadence would have been sent to Pennsylvania by the Department, a party not enumerated in FL Section 5–609. Thus, the ICPC, with its jurisdictional limitations on the Department, clearly applies to Cadence's placement in Pennsylvania. Furthermore, "the ICPC was not designed to protect the rights of birth parents; instead, it is designed to ensure that placements for children across state lines are safe." *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 317–18, 701 A.2d 110, 121 (1997).

suggest that Cadence would suffer abuse or neglect if she were to reside with [him]." Rather, both the case worker and Ms. Z. testified that Cadence and Mr. B. had a positive relationship.

### Cases Cited By Mr. B

To support his argument that the juvenile court's decision was based upon the length of time Cadence had been in the Z.'s care, and nothing else, Mr. B. relies on our decisions in *In re Adoption/Guardianship of Alonza D., Jr. and Shaydon S.,* 412 Md. 442, 987 A.2d 536 (2010) and *McDermott v. Dougherty,* 385 Md. 320, 869 A.2d 751 (2005). In *Alonza,* 412 Md. at 452–53, 987 A.2d at 542, the juvenile court terminated a father's parental rights, even after finding him to be a "fit parent," because the children had spent six years—a majority of their lives—with their foster family. When the children were no more than two years old, the Department had removed them from their mother's custody following reports of neglect, and it would not place the children with their father because the home in which he resided contained dangerous levels of lead. *See id.* at 444, 987 A.2d at 537. The juvenile court criticized the father for his failure to timely remedy his housing situation so that the children could be returned to him. *See id.* at 452, 987 A.2d at 542. Yet, it also recognized that the father had acquired appropriate housing and had satisfied other Department requests by the time of the hearing. *See id.* The court simply considered these efforts to be too late:

> [T]he Court finds that it was really within [the father's] control . . . to be able to take care of this. It was within his control to take the parenting classes to do what was required, to fix the housing to do what was required. . . .

> And what is of concern to the Court as far as length of time was that it was so much within his control to take care of this. [H]e took care of things, but he took care of them late. . . . There's a clock ticking and . . . it was almost as though [the father] sort of woke up at some point and said he was going to take care of this, but in the meantime, these

children have been living with [their foster mother] for a long time.

*Alonza,* 412 Md. at 452–53, 987 A.2d at 542. We vacated the juvenile court's decision, explaining that the court incorrectly "focused primarily on the length of time [the children] had been in foster care and the apparent bond that had developed between [the foster mother] and the children" without making any findings as to "how a continued parental relationship would have caused a detriment to the children[.]" *Alonza,* 412 Md. at 468, 987 A.2d at 551.

Similarly, in *McDermott,* the circuit court awarded custody of the son to the maternal grandparents because the father's career as a merchant marine required him to spend months away at sea, resulting in what the court considered to be an unstable living situation that was contrary to the best interests of the child. *McDermott,* 385 Md. at 324, 869 A.2d at 753. The circuit court did not find the father to be an unfit parent, but found his "relationship with [the son] to be wanting [because of] his absences from the child's life while at sea." *Id.* at 419, 869 A.2d at 809. We reversed, holding that

under circumstances in which there is no finding of parental unfitness, the requirements of a parent's employment, such that he is required to be away at sea, or otherwise appropriately absent from the State for a period of time, and for which time he or she made appropriate arrangements for the care of the child, do not constitute 'extraordinary or exceptional circumstances' to support the awarding of custody to a third party.

*Id.* at 325–26, 869 A.2d at 754.

In relying on *Alonza* and *McDermott,* Mr. B. ignores a glaring distinction between those parents and himself, and misses the mark as to the juvenile court's rationale in this case. Here, Mr. B. made the choice to absent himself from Cadence's life. He had been living in Maryland prior to his incarceration, yet he moved into a home in Pennsylvania upon his release "despite his family, other five children, and Cadence being in Charles County, Maryland." The father in

*Alonza,* on the other hand, had already been living in a home plagued with lead and could only correct the situation by moving to a new home or paying for lead abatement, a costly procedure. Even so, by the time of the hearing in *Alonza,* the father had "taken care" of his living situation by moving into a suitable home in Maryland so that his children could immediately join him. *Id.* at 452, 987 A.2d at 542.

Moreover, in this case, even though the Department "ha[d] worked with Mr. B. to the extent [it had] been able to with him living in Pennsylvania . . . even giving him gas vouchers[,]" Mr. B. visited Cadence only *18 out of 561 days,* visits that never lasted longer than four hours. Put another way, Mr. B. spent, at most, 72 hours with his daughter over this year and a half period. This means that on 62 weekends, out of roughly 80, Mr. B. decided not to travel to Charles County to see Cadence. Indeed, the juvenile court found that "Mr. B's choice to absent himself from being available for meaningful, more frequent contact with Cadence ha[d] been the biggest impediment to reunification." In contrast, the juvenile court in *Alonza* found that "[t]he visitation that [had] been provided by the Department appear[ed] to have been taken up readily by both parents, there [hadn't] been any hesitation on their part." *Alonza,* 412 Md. at 448, 987 A.2d at 539–40. The father in *McDermott* was equally proactive, even flying his son and his son's maternal grandparents "to Texas . . . to spend a week aboard [the] ship [where he was stationed] to celebrate [his son's] birthday." *McDermott,* 385 Md. at 329 n. 6, 869 A.2d at 756 n. 6.

### *Consideration of FL § 5–525(f)(1) Factors*

To be sure, the juvenile court in this case did consider the length of time that Cadence had been in the care and custody of the Z. family, as it was required to do under FL Section 5–525(f)(1)(iv): "the length of time the child has resided with the current caregiver[.]" Specifically, the court explained that "the only life [Cadence has] known and has any memory of is here, in Maryland, in the home of the Z.s. . . . [T]his chunk of time over a year, more than half of her life, is critical." Yet,

the court's analysis did not stop there; it also addressed the remaining statutory factors. As the Court of Special Appeals aptly explained, the "court's finding regarding 'the child's ability to be safe and healthy in the home of the child's parent,' FL [Section] 5–525(f)(1)(i), could not have been more explicit: 'The [child] cannot be safely returned home at this time, and to do so would be contrary to her welfare as her parents are unable to properly care for her.' " [12] The juvenile court also considered Cadence's attachment to both of the parties, thereby satisfying FL Section 5–525(f)(1)(ii) & (iii). Regarding subsection (f)(1)(ii), "the child's attachment and emotional ties to the child's natural parent[,]" the court found, following testimony and its own observations during the hearing, that "Mr. B. [was] more in the position of a beloved uncle, . . . another kind of family member, than a father." The court explained that "[t]he child's father, from her point of view, is Mr. Z." In addressing subsection (f)(1)(iii), the court observed that the Z.s had provided Cadence "a safe and stable and loving home" and that Cadence had "clearly bonded to the family." With an open adoption, Cadence would benefit from a continued relationship with her "beloved uncle", Mr. B., while also retaining the safe stability of her home with the Z.s.

The court also looked at "the potential emotional, developmental, and educational harm to the child if moved from the child's current placement[,]" FL Section 5–525(f)(1)(v). It explained that "separating Cadence from the Z.s would be

---

**12.** In an effort to counter the court's finding that Cadence could not be safe and healthy in his home, Mr. B. points to the fact that he had been allowed *"liberal and unsupervised"* visitation for up to four hours as evidence that the Department did not have any safety concerns with his home. We, however, do not find his reasoning persuasive. We think it "telling[ ]" that this visitation could never take place in Mr. B.'s Pennsylvania home, nor last longer than four hours. Mr. B. had yet to keep Cadence for the weekend, or even overnight. As the caseworker testified, the Department was unwilling to extend the hours of visitation because it could not monitor Mr. B.'s Pennsylvania home to make sure that his interactions with Cadence were positive. She also testified that she had concerns about Cadence's welfare while the child was in Mr. B.'s care. This, combined with Mr. B.'s past history of neglect and his continued willful absence from Cadence's life, supplied the evidence to support the court's decision.

traumatic and detrimental to her well-being" because that family "is the stability that she knows." Finally, in considering subsection (f)(1)(vi)("the potential harm to the child by remaining in State custody for an excessive period of time"), the court determined that Cadence "need[ed] permanence" and that adoption was "necessary in order to move towards permanency." The Department caseworker testified that any path to reunification would require a gradual increase in the hours of permissible visitation so that the Department could monitor the interactions until it was satisfied that Cadence would be safe in her father's custody. Thus, reunification was unlikely to occur in the near future. Unless the court changed the permanency plan to open adoption, Cadence would almost certainly remain in foster care limbo for an excessive period of time, one that would be detrimental to her best interests.

*Conclusion*

Ultimately, we are not persuaded that the juvenile court abused its discretion in changing the permanency plan to open adoption. Mr. B. is a father of six children, yet none of them are in his custody, and his parental rights as to three of those children have been involuntarily terminated. He has a history of drug abuse and neglect. Currently, he chooses to reside in Pennsylvania, at least four hours away from Cadence, even though he knows that Cadence cannot visit his home because the Department is unable—and Pennsylvania unwilling—to monitor her safety while there. Furthermore, he has only visited Cadence 18 out of 561 days, despite the Department's attempts to facilitate more frequent visits. As the juvenile court recognized, Mr. B.'s greatest impediment to developing a meaningful relationship with Cadence was himself:

[T]he biggest clincher of this case that makes it not a difficult decision is that Mr. B. has made his choice and chosen to stay away despite having no support up there, other than [his fiancé]. All of his family being [here], all of his children being here. And being, essentially assuring

that he would have limited contact with Cadence by living there.

The juvenile court kept in mind the constitutional right of Mr. B. to parent Cadence, yet it understood that Mr. B. had not overcome his tendency to neglect his children. Thus, as it could not consider Mr. B. as a placement resource,[13] the court had to determine whether it was in Cadence's best interest to remain, perhaps indefinitely, in foster care. Generally, courts and legislatures attempt to limit the amount of time a child is in foster care, citing its detrimental effect on a child's well-being:

> For children in foster care, . . . the court must consider whether the individual child's health and safety is being compromised by the long term effects of foster care. Federal and state governments have recognized that long periods of foster care may harm the very children whom the foster care system is designed to protect. They have undertaken reasonable steps to prevent childhoods spent in "foster care drift"—the legal, emotional, and physical limbo of temporary housing with temporary care givers.

*In re Adoption/Guardianship of Victor A.*, 157 Md.App. 412, 427–28, 852 A.2d 976, 985 (2004); *see also In re Abiagail C.*, 138 Md.App. 570, 584, 772 A.2d 1277, 1286 (2001) (explaining that the General Assembly revised the adoption and guardianship laws "to speed up the guardianship and adoption process so that children no longer would be consigned to foster care limbo for years."). Here, the court understood that unless it changed Cadence's permanency plan, she would remain in foster care and could not achieve the permanence that it deemed to be in her best interest. The court needed to fashion an alternative plan, and we find no error in its decision to change Cadence's plan to open adoption.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE**

---

**13.** According to FL Section 9–101(b), "[u]nless the court specifically finds that there is no likelihood of further . . . neglect by the [parent], the court shall deny custody or visitation rights to that [parent.]"

COURT OF SPECIAL APPEALS TO BE PAID BY PETI-TIONER.

Judge HARRELL joins in judgment only.