REPORTED
IN THE COURT OF SPECIAL APPEALS
OF MARYLAND
No. 693
September Term, 2013

IN RE JOY D.

Eyler, Deborah S.,
Graeff,
Thieme, Raymond G., Jr.
    (Retired, Specially Assigned),

JJ.

Opinion by Graeff, J.

Filed: January 29, 2014

Crystal D., appellant, appeals from an order of the Circuit Court for Baltimore City, sitting as a juvenile court, granting the motion of the Baltimore City Department of Social Services ("BCDSS") to waive its obligation to continue to make reasonable efforts to reunify Ms. D. with her daughter, Joy D.[1]  On appeal, Ms. D. presents the following question for our review, which we have rephrased, as follows:

> When a local department of social services files a motion to waive reasonable efforts to reunify a parent and child pursuant to Md. Code (2013 Repl. Vol.) § 3-812 of the Courts & Judicial Proceedings Article ("CJP"), is the court required to grant the motion when it finds that the parent has had his or her parental rights to other children involuntarily terminated?

> For the reasons set forth below, we shall affirm the judgment of the circuit court.

### FACTUAL AND PROCEDURAL BACKGROUND

Ms. D. has a long history with BCDSS and the court system, involving each of her five children: Joshua, born June 19, 1991; India, born July 7, 1996; Linda, born July 21, 1999; Malachi, born June 11, 2007; and, Joy, born September 21, 2002.  We previously set forth the background of Ms. D.'s involvement with BCDSS in *In re Malachi D. and Joy D.*, No. 3006, Sept. Term, 2010 (filed Sept. 20, 2011), an appeal involving the dismissal of children in need of assistance petitions ("CINA")[2] pertaining to Malachi and Joy.

---

[1] The order eliminated the Baltimore City Department of Social Services' obligation to provide reasonable efforts to reunify Ms. D. with another child, Malachi D., but Ms. D. did not appeal the order with respect to Malachi.

[2] A child in need of assistance is "a child who requires court intervention because: (1) [t]he child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) [t]he child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs."  Md. Code (2013 Repl.
(continued...)

On June 18, 1998, Ms. D. brought Joshua to Johns Hopkins Hospital and requested that he be evaluated and hospitalized. When the hospital staff informed her that Joshua did not require hospitalization, Ms. D. became so upset that the police were called, and she subsequently was hospitalized for psychiatric treatment.

On August 6, 1998, with Ms. D.'s consent, the Circuit Court for Baltimore City found Joshua and India to be CINA and removed them from Ms. D.'s custody. The children were placed with their maternal grandparents. Ms. D. previously had expressed a desire to place the children for adoption, and she had only "sporadic" contact with Joshua after the placement. Joshua, who has since turned 21 years old, was never reunified with Ms. D.

Ms. D.'s parental rights with respect to India and Linda, who was found to be CINA on October 1, 1999, were terminated on November 6, 2003, after a contested hearing.[3] Prior to the termination of Ms. D.'s parental rights to India and Linda, Dr. Dale L. Peterson diagnosed Ms. D. with borderline personality disorder, a "chronic and severe" condition that results in "'very, very fractured'" interpersonal relationships and "'inappropriate displays of anger and affective instability,' including 'sudden fits of rage.'" Dr. Peterson opined that Ms. D.'s disorder made it "'highly unlikely that she could provide an environment of

_____

[2](...continued)
Vol.) § 3-801(f) of the Courts and Judicial Proceedings Article ("CJP").

[3] This Court affirmed the termination of parental rights for both children in an unreported opinion, *In re Adoption/Guardianship of India S. and Linda B.*, No. 2032, Sept. Term, 2003 (Nov. 29, 2004).

adequate safety and emotional stability for her children.'" Her "unpredictability also affected her willingness to parent, and . . . at times, she wanted to waive her parental rights.'"

In 2000, Ms. D. met Elliott D. He was abusive and forced her into sexual activity. Despite the abuse, Ms. D. married Elliott D. in 2002 when she was pregnant with Joy. Ms. D. believed that, by being married to Elliott D., it would be less likely that BCDSS would remove Joy from her care, as it had with her other children. Ms. D. and Elliott D. never lived together, and he contributed very little to Joy's care.[4]

In June 2006, when Joy was three years old, Ms. D. took her to the emergency room at Johns Hopkins Hospital after Joy had fallen and injured her lip. While Ms. D. was registering Joy, she became hysterical and verbally abusive to Joy and the registration coordinator. A social worker who witnessed the incident took Ms. D. to a separate room. Once Ms. D. calmed down, she reported that she was a victim of domestic violence, and the incident with the registration process had triggered feelings "of everyone treating her like she was nothing." Joy appeared to have "some fear of her mother." Hospital staff provided Ms. D. with a number of referrals for support services, including the House of Ruth, BCDSS Adult and Family Support Unit, and Turnaround, a program that assists families and children who have witnessed violent acts. Ms. D., however, never enrolled Joy in mental health services.

---

[4] Elliott D., Joy's father, has said that he is unable or unwilling to provide care for Joy. He is not a party to this appeal.

Joy's first contact with BCDSS was in 2007. On May 29, 2007, BCDSS filed a Petition with Request for Shelter Care with regard to Joy. Shortly after Malachi's birth, on July 17, 2007, BCDSS initiated shelter care proceedings for him, as well. The juvenile court authorized Joy's placement in shelter care, but it denied the initial request for shelter care for Malachi, ordering instead that Ms. D. ensure that Malachi receive "'all necessary medical care'" and cooperate with BCDSS and hospital staff. On October 5, 2007, the petitions were dismissed without prejudice at the request of BCDSS, following Ms. D.'s compliance with the court's orders.

On March 13, 2009, while at a local hospital, Ms. D. was observed hitting twenty-one-month-old Malachi on his back. Someone contacted the police, and a child protective services report was filed. BCDSS concluded that there was no neglect, but based on Ms. D's statement to a social worker at the hospital that she was overwhelmed with the care of her children, BCDSS placed both Joy and Malachi in shelter care. At the shelter care hearing on March 16, 2009, the court ordered that Joy be kept in shelter care. The court denied shelter care for Malachi, but it issued an order controlling conduct, which specified that Ms. D. not use physical discipline against Malachi and permit announced and unannounced visits by BCDSS and the child's counsel. Joy subsequently was returned to Ms. D.'s custody, but the order controlling conduct was continued.

On July 13, 2009, a BCDSS social worker made a visit to Ms. D.'s home. While the social worker interviewed Joy, Ms. D. became very upset and stated, in front of Joy, that Joy

was "'an evil devil.'" Based on Ms. D.'s statement and conduct, the children's counsel filed a motion for immediate review of the children's CINA petitions. Prior to that hearing, on August 31, 2009, BCDSS placed Joy and Malachi in the home of Charlene and Herbert K., after Ms. D. requested psychiatric hospitalization of Joy. On September 1, 2009, the juvenile court ordered that Joy and Malachi be placed in shelter care. Joy adjusted well to Mr. and Ms. K.'s home, bonded with the family, and improved in all areas of development.

During a supervised visit in April 2010, after Joy referred to her foster mother as her mother, Ms. D. became verbally aggressive and threatened to kill the BCDSS family preservation worker, Chante Hoke-King. Joy was frightened and cried uncontrollably. The police had to be called to escort Joy, Malachi, and the foster parent away from the building.

In May 2010, BCDSS developed a service agreement for Ms. D., offering mental health services and parenting classes, to try to work toward reunification. Ms. D. denied having mental health issues and declined both individual therapy and family counseling. She also missed many scheduled visits with the children. Ms. D.'s desire to have Joy return home was "inconsistent and when positive conditioned on evil spirits being out of Joy." Ms. D. referred to Joy as a "demon of hell," whom she did not "really like," and she stated that Joy needs to be "out [of] my house" and "should be with her bipolar and abusive father instead and drive him crazy." She also sent approximately 2,000 e-mails to Ms. Hoke-King, protesting BCDSS' involvement in her life.

-4-

In July 2010, an adjudicatory hearing was held. The Master recommended dismissal of Malachi's petition and sustained certain allegations in Joy's petition. The Master recommended finding that Ms. D. had acted in ways that had caused Joy emotional harm, and she had been aggressive toward BCDSS workers, threatening to kill one of them in front of Joy. On October 20, 2010, the Master recommended that Joy be found a CINA and committed to BCDSS. Ms. D. filed exceptions in Joy's case. On January 21, 2011, after a *de novo* hearing, the court dismissed the CINA petitions, and Joy and Malachi were returned to the care and custody of Ms. D.[5]

On June 25, 2011, while the appeal was pending in this Court, Joy called 911 and reported that she was being abused; she requested BCDSS involvement. Joy told the responding police officers that her mother had hit her on her bottom.[6]

After the police left, Ms. D. took Joy to the emergency room at Johns Hopkins Hospital. She reported that Joy's alleged behavior was unmanageable, and she did not want Joy home with her. She stated that Joy needed to be returned to foster care because Ms. D. could not manage Joy's behavioral problems. Joy also reported to social worker Kathleen Orr that she wanted to return to her previous foster family. Even when she was

---

[5] As indicated, on September 20, 2011, we vacated the judgment and remanded the matter for further proceedings. The circuit court consolidated the 2009 petitions and the 2011 petitions.

[6] Ms. D. subsequently sent an e-mail to BCDSS social worker, Diana Wade stating that her boyfriend, Henry E., had "threatened Joy sexually on 6/25/11," and Joy had reported to her "multiple times her fear that he will sexually abuse her." Ms. D. also stated that Mr. E. had expressed an interest in "pimping [Joy] out."

informed that she might not be able to return to her previous foster family, she persisted in her desire to return to foster care.

After extensive discussion with hospital staff, Ms. D. determined that she would be able to safely manage Joy until Monday with the help of her fiancé, Henry E., who agreed to stay in the home and help her until Monday morning. Ms. D. did not report to hospital staff Joy's concerns about potential sexual abuse by Mr. E.

On June 28, 2011, Ms. D. again took Joy to the emergency room at Johns Hopkins Hospital and requested an emergency psychiatric evaluation. The hospital did not admit Joy. On June 29, 2011, Ms. D. took Joy to University of Maryland and reported that Joy required an emergency psychiatric evaluation for her "bad behavior." When Ms. D. was informed that Joy would not be admitted, she became violent and verbally abusive. In an effort to calm Ms. D., the treatment team agreed to have Joy transferred to a pediatric clinic for evaluation. Ms. D.'s aggressive behavior continued, however, and she threatened a social worker.

During the interview with a social worker, Ms. D. repeatedly called Joy a "liar" and a "horrible child" and loudly denigrated Joy in Joy's presence. Ms. D. became increasingly agitated and began making delusional statements. Joy and Malachi sat very close to one another on one chair, and Joy appeared to make herself as small as possible, getting closer and closer to Malachi, indicating in a soft voice, "I don't like when mommy gets angry like this." The social worker concluded that Ms. D. needed a psychiatric evaluation in light of her "observed paranoid and irrational behavior," and that Joy "was not safe with her mother

exhibiting these behaviors." BCDSS removed Joy, and on June 30, 2011, the juvenile court ordered the continuation of Joy's placement in shelter care. BCDSS was able to place Joy back into the K.'s home. Joy has never returned to Ms. D.'s home.

On June 25, 2011, Diana Wade[7] was assigned to work with the D. family. Initially, Ms. D. acknowledged Ms. Wade's efforts and reported that she had a good rapport with her. Ms. D. still insisted that Joy was a liar and the "major problem [in] the case." She persisted in her belief that Joy was the "devil's child," and that the devil uses Joy. She thought that Joy needed an exorcism, stating that she wanted Joy returned to her only if Joy was "assessed for possible possession."

On July 26, 2011, Ms. D. contacted BCDSS. She was extremely anxious and overwhelmed. A family preservation worker, Ravital Shalev, met with Ms. D. for a home safety assessment. Ms. D. reported that she was overwhelmed by Malachi and his emotional needs. She stated that she was extremely frustrated, and she asked that Malachi be removed from her care. Ms. D. was offered family preservation services, as well as mental health, parenting, counseling and financial assistance services, but she "wanted none of it." The following day, BCDSS filed a petition for shelter care, and Malachi was removed from the

---

[7] Ms. Wade is sometimes referred to in the record as Ms. Wade-Williams. For purposes of consistency, we shall refer to her as "Ms. Wade."

home.  Malachi was placed in the same home as Joy, first with the K.'s, and then later with Ms. W.[8]

In May 2012, a forensic psychiatrist, Ronald Means, completed psychiatric evaluations of Ms. D., Joy, and Malachi.  Dr. Means concluded that Ms. D. has "signs of mania with severe irritability and seemingly erratic behavior."  She also has problems with anxiety and appeared "severely paranoid" at times.  Dr. Means diagnosed Ms. D. with Borderline Personality Disorder, which is a "pervasive pattern of instability of interpersonal relationships, self-image, and emotions."

Dr. Means found Joy to be well-adjusted despite her disrupted childhood.  Joy advised Dr. Means that her foster home was a "better, safer, nicer environment."  With respect to visitation, Joy stated that she "sometimes" enjoyed seeing her mother, but she did not want to live with her and would rather be adopted and communicate with Ms. D. through letters or e-mail.  In describing Ms. D.'s emotional responses, Joy stated: "One time she'll love you, and another time, she'll hate you.  She yells and screams."

LaShaunna Lipscomb, a therapist at Neighbor to Family, told Dr. Means that Joy had done very well since being in foster care.  She indicated that Joy "walks on eggshells" during supervised visitation with Ms. D., and that Ms. D. is "very volatile" and "no one knows what sets her off."

---

[8] On October 19, 2012, Joy and Malachi were placed with Ms. W., Malachi's paternal aunt.  Joy and Malachi have different fathers.  For Joy, Ms. W. is a foster placement.  Ms. W. is a licensed therapeutic foster provider through Arrow Project.

Dr. Means concluded that Ms. D.'s personality disorder had "severely affected her functioning throughout the years," and it had impacted her ability to parent her children. He stated that it was "particularly problematic that she remains ambivalent about whether she wants Joy to return to her care and only wants to accept her back under conditions that are unrealistic," such as having an exorcism and assessment for possession. Dr. Means opined that Ms. D. needed prolonged individual therapy and medications in order to "begin to demonstrate stability," but he noted that Ms. D. was "not invested in mental health treatment and does not believe in mental illness." Ms. D. also had "no insight into her level of dysfunction and does not intend to participate in ongoing treatment." He concluded that Ms. D.'s "ability to provide nurturance, supervision and adequate care for her children will continue to be significantly impacted by her severe personality disorder."

In July 2012, the juvenile court held adjudicatory and disposition hearings for Joy and Malachi. The court conducted an *in camera* interview of Joy and Malachi, and found that, although they loved Ms. D., they both were "visibly afraid of Mother's anger and mood shifts and both wish to remain in the care of Ms. K." The court found Joy to be a CINA and committed her to the custody of BCDSS. It found that BCDSS had made reasonable efforts to reunify Joy with Ms. D. by facilitating weekly visitations, making referrals, offering service agreements, maintaining contact with Ms. D., placing the children together, and ensuring the children's needs were met. Ms. D., however, had been uncooperative at times, and she had failed to appear for scheduled meetings, refused to allow BCDSS caseworkers

to enter her home, failed to regularly visit with Joy, and failed to follow through with aftercare services for Joy. The court noted that Ms. D. had demonstrated "fits of rage," and had not been amenable to treatment for her mental health disorders because she did not believe that there was "such thing as mental illness." The permanency plan was reunification.

On April 18, 2013, the court held a permanency planning review hearing. There was testimony regarding attempts to get counseling for Ms. D. She had been referred to Hebron House, a psychological therapeutic house providing counseling services, but Hebron House indicated that they could not help Ms. D. Ms. D. next sought mental health counseling at APEX, an outpatient mental health center, but it withdrew from services because of the "distraction of Mother's constant e-mails." Ms. D. indicated that she would not participate with BCDSS family involvement meetings.

Ms. D. had completed anger management classes and parenting classes. She had maintained contact with BCDSS through letter and by e-mail, as well as during her weekly visits with the children. Ms. D.'s supervised visits were "generally going well." Ms. Wade described one visitation, however, on February 26, 2013, when Ms. D. tried to give Malachi a time out for not wanting to look at a video. Malachi responded: "Don't kill me." On another visit, Malachi was kicking and screaming because there was no computer mouse. Ms. D. became agitated and threatened to call the police. When Malachi continued to kick and cry, Ms. D. became increasingly agitated and displayed rage in front of the children.

Ms. D. accused Ms. Wade of abusing her. Following the visit, Malachi had to be placed in respite care for two days. The court found that, although Ms. D. had completed anger management classes, these events showed that she had not overcome her severe mood swings and mental health disorder.

At the conclusion of the hearing, the court found, in pertinent part, as follows:

Mother has previously indicated that she was overwhelmed by parenting [the children] when they were last removed – and Mother's testimony today indicates that she was similarly overwhelmed on 4/9/2013. The continued cycle of Mother's erratic and sometimes cycling rage behavior (leveled at various points at everyone involved in these proceedings – and even to [the children]) is imminently dangerous to the emotional safety of the [children] – [Malachi's] two days of respite care and previously regressive behaviors after visiting with Mother are strong and persuasive of this continuing risk to [the children's] safety raised by this record and recent events.

Mother has continued to devote considerable efforts to challenge her mental health diagnosis and indeed the existence of any mental health illness. Regardless of differences of opinion on the underlying issues, the [c]ourt continues in its finding that the emotional injury of Mother's cycling rage behavior, while perhaps improved in some small measure, remains at a level which is a real and serious threat to the emotional health and mental health of [the children]. Joy and Malachi deserve and need the stability of parenting that meets their emotional and developmental needs.

While Mother loves [the children] and has made significant efforts to comply with the court's orders and BCDSS service agreements; unfortunately, those efforts, both reasonable by BCDSS and those by Mother, have not made Mother closer to the ability to parent [the children] than Mother was when [the children] were last removed upon Mother's admission that she was overwhelmed.

* * *

It would be contrary to [the children's] welfare to return to the care of their Mother today: Mother's [erratic] and sometimes explosive rage is emotionally

-11-

injurious to [the children] and the most recent occurr[e]nce of that behavior on 4/9/2013 establishes that Mother's mental health issues have not resolved to a point where [the children] can or should be in their best interest and [safety] be placed in Mother's care. The [c]ourt is also persuaded that [Joy] does not [presently] wish to return to Mother's care.

After finding that BCDSS had made reasonable efforts to achieve the permanency plan of reunification, the court changed the permanency plan to a concurrent plan of reunification and relative placement for custody and guardianship. It set the next hearing for July 9, 2013.

In May 2013, Ms. D. became unwilling to continue to work with Ms. Wade. She sent a series of e-mails to Ms. Wade stating that she was "eliminating" her from the case and from supervising visits. She accused Ms. Wade of lying and "false reporting," and she advised Ms. Wade not to contact her unless it was an emergency. She also accused Ms. Wade of making her physically ill, and she stated that she would file a police report against Ms. Wade if she received any certified mail from her. Ms. D. also threatened to "press criminal charges for harassment and assault."

On May 9, 2013, BCDSS filed a motion to waive the requirement that it continue to make reasonable efforts to reunify Joy and Malachi with Ms. D. The motion noted that Joy had been out of Ms. D's care continuously since June 30, 2011, Ms. D. had a long history of not being able to provide for her children, and on November 6, 2003, the court had involuntarily terminated her parental rights to Linda and India.[9] BCDSS asserted that it had

---

[9] A copy of the 2003 Order was attached to the motion.

-12-

not sought a waiver previously because it was attempting to give Ms. D. another opportunity to address the reasons for the children's placement in BCDSS's care, and in deference to the court's decision to continue a plan of reunification. Ms. D., however, had demonstrated repeatedly that she had no understanding of her untreatable condition, which was "immune to intervention." BCDSS asserted that, in addition to the authority provided by statute, it was in the children's best interest that efforts for reunification cease, noting that Ms. D.'s condition had not improved since 1998. Accordingly, BCDSS requested that the court waive the requirement that it make reasonable efforts at reunification, and it requested a permanency planning hearing.

Ms. D. did not file a written response. Joy, through counsel, joined in BCDSS's request. She attached as exhibits Ms. D.'s e-mails indicating that she no longer would work with Ms. Wade, which Joy noted would make it "virtually impossible" and "futile" "for BCDSS to continue to engage her in efforts toward reunification."

On May 30, 2013, the court heard argument on the motion. BCDSS presented evidence that Ms. D.'s parental rights to two of her children had been terminated, and this was the third CINA petition involving Joy and Malachi. Indeed, it asserted, this was the 40th hearing for Joy, who had been in the care of BCDSS for two years, and "[a]t this point there is nothing else that we can do for this parent and we're asking you to waive reasonable efforts based on the statute."

Counsel for Joy noted that the court's April 18 order stated that Ms. D. still had "erratic and explosive rage," which was a danger to the children, and Ms. D. was "no closer to the ability to care for the children than she had been when the children were last removed." She also referred to the e-mails from Ms. D., indicating that Ms. D. was "no longer allowing the [BCDSS] to work with her" and was "going to do her bonding with the children in some way that didn't include the workers or supervised visitation." On that basis, counsel stated that she did not believe that BCDSS could continue to make reasonable efforts to reunify Ms. D. with Joy, and Joy's progression toward permanency should not be further delayed.

Ms. D.'s counsel did not refute any of these arguments. She argued only that Ms. D. was frustrated because BCDSS had changed the location of her visits with Joy and Malachi after the court ordered that the visits remain the same.

Counsel for BCDSS responded that visits had been held in many locations, including a library that had barred Ms. D., and there was no requirement regarding where visits were to take place. He argued that Ms. D.'s social workers had "bent over backwards" for her, but she was no closer to reunification than she was when the children initially were sheltered. He stated that there was nothing else that BCDSS could do for the family.

Counsel then stated that it was a "mandatory waiver per reading of the statute." After the court asked: "What's the mandatory part?" the following ensued:

[COUNSEL FOR BCDSS]: "If the [c]ourt finds by clear and convincing evidence that any of" – this is Section (d).

THE COURT: All right.

[COUNSEL FOR BCDSS]: "That any of the circumstances specified in Subsection (b) of this section exists, the [c]ourt shall waive the requirement that reasonable efforts be made to reunify the child –"

THE COURT: All right.

[COUNSEL FOR BCDSS]: "– with the child's parent or guardian." Thank you.

THE COURT: All right. All right. Motion's granted.

This appeal followed.[10]

## STANDARD OF REVIEW

Maryland appellate courts review child custody cases under three "different but interrelated" standards of review. *In re Adoption/Guardianship of Cadence B.*, 417 Md. 146, 155 (2010). First, we review factual findings under the clearly erroneous standard. *Id.* Second, we review purely legal questions *de novo*, requiring further proceedings except in cases of harmless error. *Id.* Finally, we review "the ultimate conclusion of the [juvenile

---

[10] An order waiving the requirement to make reasonable efforts to reunify a parent with his or her child is appealable pursuant to CJP § 12-303(3)(x), which provides that a party may appeal from an interlocutory order that "[d]epriv[es] a parent . . . of the care and custody of his child, or chang[es] the terms of such an order." To be appealable within this statutory exception, an order must adversely affect the parent's rights. *In re Joseph N.*, 407 Md. 278, 288 (2009). *See In re: Karl H. and Anthony H.*, 394 Md. 402, 430 (2006) (If an order changes an antecedent custody order in a way that "could deprive a parent of the fundamental right to care and custody of his or her child, whether immediately or in the future, the order is an appealable interlocutory order."); *In re Damon M.*, 362 Md. 429, 438 (2001) (holding that despite their interlocutory nature, court orders regarding permanency plans are immediately appealable). Waiving a department's obligation to make reasonable efforts at reunification adversely affects the parent's right to the care and custody of his or her child.

court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous" for a "clear abuse of discretion." *Id.* (quoting *In re Yve S.*, 373 Md. 551, 586 (2003)).

## DISCUSSION

When a child is removed from his or her parent's care and custody and placed in foster care, a department of social services has a statutory obligation to make reasonable efforts to reunify the child with the parent. *In re Joseph N.*, 407 Md. 278, 291-92 (2009).[11] The statutory scheme presumes that, "unless there are compelling circumstances to the contrary, the plan should be to work toward reunification, as it is presumed that it is in the best interest of a child to be returned to his or her natural parent." *In re Yve S.*, 373 Md. at 582.

At issue in this case is the circuit court's application of CJP § 3-812 in waiving the requirement that BCDSS make efforts to reunify Joy with Ms. D. That statute provides that a department of social services "may ask the court to find that reasonable efforts to reunify

---

[11] In that regard, Md. Code (2012) § 5-525(e) of the Family Law Article provides:

(e) *Reasonable efforts.* — (1) Unless a court orders that reasonable efforts are not required under § 3-812 of the Courts Article or § 5-323 of this title, reasonable efforts shall be made to preserve and reunify families:
    (I) prior to the placement of a child in an out-of-home placement, to prevent or eliminate the need for removing the child from the child's home; and
    (ii) to make it possible for a child to safely return to the child's home.
    (2) In determining the reasonable efforts to be made and in making the reasonable efforts described under paragraph (1) of this subsection, the child's safety and health shall be the primary concern.

-16-

a child with the child's parent or guardian are not required" if the department concludes that

the parent has:

(1) Subjected the child to:
    (i) Chronic abuse;
    (ii) Chronic and life-threatening neglect;
    (iii) Sexual abuse; or
    (iv) Torture;
(2) Been convicted, in any state or any court of the United States, of:
    (i) A crime of violence against:
        1. A minor offspring of the parent or guardian;
        2. The child; or
        3. Another parent or guardian of the child; or
    (ii) Aiding or abetting, conspiring, or soliciting to commit a crime
described in item (i) of this item; or
(3) *Involuntarily lost parental rights of a sibling of a child*.

CJP § 3-812(b) (emphasis added).

When the local department makes a request to waive the obligation to provide

reasonable efforts for reunification, CJP § 3-812(d) sets forth the action to be taken by the

court. It provides:

If the court finds by clear and convincing evidence that any of the
circumstances specified in subsection (b) of this section exists, the court *shall*
waive the requirement that reasonable efforts be made to reunify the child with
the child's parent or guardian.

(Emphasis added).[12]

_____

[12] CJP § 3-812(e) provides:

(e) *Permanent placement of child.* — If the court finds that reasonable
efforts are not required, the local department shall:
    (1) Request that a permanency planning hearing be held in accordance
with § 3-823 of this subtitle within 30 days after the court makes the finding;

(continued...)

-17-

Ms. D. contends that the court erred in granting the motion by BCDSS to waive the requirement that it provide reunification services to her. She asserts that, pursuant to CJP § 3-812, the court must exercise discretion in waiving the right to reunification services, but the court here believed that it was required to grant the motion and did not exercise this discretion. Although she acknowledges that the statute uses the word "shall," she asserts that interpreting the statute as mandating a waiver of reasonable efforts where a parent has had a prior involuntary termination of parental rights would "nullify the court's obligation to consider what is in the child's best interests," and it would violate the parent's fundamental constitutional right to raise his or her children free from undue and unwarranted interference on the part of the State.

She further argues that, even if the record could be construed to suggest that the court did exercise discretion, it abused its discretion. This is so, she asserts, based on its finding at the previous review hearing that Ms. D. was in "substantial, if not total, compliance with her court-ordered services," noting that the existence of remaining "problems was not a sufficient basis to waive reasonable efforts."

BCDSS contends that, pursuant to the plain language of CJP § 3-812(d), the court is *required* to grant a local department's motion to waive the obligation to make reasonable

[12](...continued)
and

      (2) Make reasonable efforts to place the child in a timely manner in accordance with the permanency plan and complete the steps necessary to finalize the permanent placement of the child.

-18-

efforts to reunify a parent and a child when the court finds the existence of one of the circumstances in § 3-812(d), such as the involuntary loss of parental rights of a sibling child. It asserts that the legislative history, and the statutory purpose, i.e., to prevent children from languishing in foster care for years while local departments continue to make efforts to achieve reunification with hopelessly dysfunctional families, confirms this construction of CJP § 3-812. Alternatively, BCDSS asserts that, even if the court was required to exercise discretion, it properly did so, because there was overwhelming evidence to support the ruling, particularly Ms. D.'s repeated failures to address the root causes of Joy's placement in foster care, her history of uncontrollable rages, and her refusal to cooperate with services.

With respect to Ms. D.'s constitutional challenge, BCDSS argues that Ms. D. has waived this argument because she did not raise it below. In any event, it argues, a mandatory grant of a motion to waive the obligation to make reasonable efforts to reunify a parent with his or her child does not violate Ms. D.'s fundamental constitutional rights.

Joy also contends that the court properly waived the obligation of BCDSS to continue to provide reunification services to Ms. D. She asserts that the court had ample evidence before it to support a waiver of reasonable efforts. Joy argues that where, as here, reunification services would be futile and the child's best interests require a realistic permanency plan, the local department is not required to continue to offer services.

**I.**

**Application of CJP § 3-812(d)**

The first question we must address is the meaning of the language in § 3-812(d), which requires that, upon a finding of the existence of a statutory waiver condition, the court "shall waive the requirement" of reasonable efforts toward reunification. Specifically, we must determine whether § 3-812(d) creates a mandatory obligation on the court to grant a local department's request to waive the obligation to make reasonable efforts to reunify a parent and a child when the court finds that one of the statutory waiver conditions exist.

In making that determination, we apply well-settled principles of statutory interpretation:

> In statutory interpretation, our primary goal is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules. We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory. If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. If, however, the language is subject to more than one interpretation, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute. When the statute is part of a larger statutory scheme, it is axiomatic that the language of a provision is not interpreted in isolation; rather, we analyze the statutory scheme as a whole considering the purpose, aim, or policy of the enacting body, and attempt to harmonize provisions dealing with the same subject so that each may be given effect.

*State v. Phillips*, 210 Md. App. 239, 259-60 (2013) (quoting *Lowery v. State*, 430 Md. 477, 490 (2013)).

In light of these principles, we start by looking to the language of the Act itself, which provides that, upon certain conditions, the court "shall waive" the obligation to provide

-20-

reunification efforts.[13]  The use of the word "shall" is significant; it "ordinarily indicates a mandatory intent, unless the context of the statute indicates otherwise." *Burch v. State*, 358 Md. 278, 284 (2000). *Accord Perez v. State*, 420 Md. 57, 63 (2011) ("'When the Legislature commands that something be done, using words such as "shall" or "must" rather than "may" or "should," the obligation to comply with the statute or rule is mandatory.'") (quoting *State v. Green*, 367 Md. 61, 82 (2001)); *Miller v. City of Annapolis Historic Preservation Comm'n*, 200 Md. App. 612, 639-40 (2011) (Shall requires a particular course of action, and accordingly, it is mandatory.).  Thus, pursuant to the plain language of the statute, upon a finding, by clear and convincing evidence, that the parent has involuntarily lost his or her rights to a sibling of the child, a court has a mandatory obligation to grant a motion filed by the local department to waive the obligation to continue to make reasonable efforts for reunification.[14]

---

[13] These conditions include a motion filed by a local department requesting a waiver, and a finding by the court, by clear and convincing evidence, that one of the circumstances specified in CJP § 3-812(b) exists.  Appellant does not dispute that these conditions were shown in this case.  Indeed, she admits in her Brief in this Court that "[t]here was no dispute that on November 6, 2003, the Circuit Court for Baltimore City terminated the parental rights of Ms. D. to two daughters, India S.-B. and Linda B."

[14] This construction of the statute does not mean that a parent who has involuntarily lost parental rights to a child will not receive reasonable efforts for reunification in the event of a subsequent CINA proceeding of a sibling.  Pursuant to the statute, the local department is not required to request discontinuation of reasonable efforts for reunification.  Rather, the statute provides that the local department "*may* ask the court to find that reasonable efforts to reunify a child with the child's parent or guardian are not required."  CJP § 3-812(b) (emphasis added).  Thus, as in this case, despite the existence of a statutory waiver condition, the department can choose not to file a motion unless it is convinced that reasonable efforts

(continued...)

The legislative history of CJP § 3-812(d) supports the interpretation that the statute imposes a mandatory obligation on the court. In *In re James G.*, 178 Md. App. 543 (2008), we reviewed in depth the background regarding the "reasonable efforts" requirement, and the significant changes made to federal law in 1997 based on concerns that children were lingering in foster homes for too long because agencies were "'engaged in excessive efforts to 'repair hopelessly dysfunctional families'" and were "'being reunited with parents when it was not safe to do so in the name of reasonable efforts.'" *Id.* at 575-76 (quoting Kathleen S. Bean, *Reasonable Efforts: What State Courts Think*, 36 U. Tol. L. Rev. 321, 326 (2005)). The 1997 changes to federal law included a requirement that states, in order to receive federal subsidies, must provide for the waiver of the requirement that local departments make reasonable efforts to reunify the child with the parent under specified circumstances. *See* 42 U.S.C. § 671(a)(15)(D), Adoption and Safe Families Act of 1997 ("AFSA").

In 1998, in response to the AFSA waiver requirements, the General Assembly passed House Bill 1093, which initially was codified at CJP § 3-812.1. *See* 1998 Md. Laws, ch. 539. With respect to the court's obligation to waive the reasonable efforts requirement upon request, the initial bill contained the language "shall," which was amended by the House Judiciary Committee to "may," but was changed again by the Conference Committee. The explanation for the change was to strike "the language in the [amended House] Bill that would have made it discretionary for a court to grant a waiver of the local department's

[14](...continued)
for reunification are futile.

obligation to provide reunification services if aggravated circumstances exist, and substitute[] language making it <u>mandatory</u> for a court to grant a waiver of these obligations under those circumstances." Conference Committee Report to HB 1093 at 1-2. In 2001, CJP § 3-812.1 was re-enacted as CJP § 3-812(d), with no change regarding the mandatory language. 2001 Md. Laws, ch. 415. The legislature's intent in this regard is clear.

Accordingly, we hold, pursuant to the plain language of the statue, as well as the legislative history, that the language of CJP § 3-812(d) is mandatory. When a local department requests the court to waive its obligation to continue reunification efforts, and the court finds, by clear and convincing evidence, that one of the statutory waiver conditions exists, including that the parent involuntarily lost parental rights to a sibling child, the court is *required* to grant the motion. The circuit court did not err in granting the motion to waive the obligation of BCDSS in this case.

## II.

### Constitutional Challenge

As indicated, Ms. D. contends that, if § 3-812 is construed, as we have held, to be a mandatory requirement that the court waive the obligation for reasonable efforts for reunification, then the statute is unconstitutional. As BCDSS and Joy point out, however, Ms. D. did not raise a constitutional argument before the circuit court. Accordingly, we decline to address such a challenge now. *See* Md. Rule 8-131(a). In *Hall v. State*, 22 Md.

App. 240, 245-46 (1974), we explained the significance of the lack of preservation regarding

a constitutional claim:

> On matters of such import and significance as constitutional questions, we cannot overstress the necessity of preserving the issue below. . . . "[N]othing is better settled than the rule that the question as to the constitutionality of a statute will not be considered on appeal when not properly raised and decided by the lower court."

(Quoting *Vuitch v. State*, 10 Md. App. 389, 398 (1970)). *Accord Seat Pleasant Baptist*

*Church Bd. of Tr. v. Long*, 114 Md. App. 660, 677-78 (1997) (constitutionality of a statute

will not be considered on appeal when not raised below).

**JUDGMENT AFFIRMED. COSTS TO
BE PAID BY APPELLANT.**