703 A.2d 1279

**In re IRIS M.**

**Nos. 541 and 1852, Sept. Term, 1996, 141, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Jan. 6, 1998.

Geraldine Kenney Sweeney, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Shelly E. Mintz, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before THIEME and BYRNES, JJ., and ROBERT F. FISCHER, Judge (retired), Specially Assigned.

ROBERT F. FISCHER, Judge (retired), Specially Assigned.

In this case, we are considering three consolidated appeals from the District Court of Maryland for Montgomery County, Juvenile Division. The alleged effect of all three orders appealed from is the same, that is, denying to appellant,

Manuel M., father of the minor child, Iris M., any contact with his sixteen-year-old daughter.

The issue presented to us, as phrased by appellant, is:

Did the trial judge err in ordering no contact between Iris and her father where there was neither agreement nor factual finding nor support in the record for such an order?

## FACTS

The facts, as presented by appellant, are that Iris was born in El Salvador on February 2, 1981. Iris was apparently abandoned by her mother when she was seven months old and was thereafter raised by her father and paternal grandmother. Due to his involvement in the civil war in El Salvador, Mr. M. was forced to flee the country in 1987. He left Iris in the care of her grandmother.

Mr. M. established permanent residency in the United States, obtained employment as an automobile mechanic, and in 1981, married Katherine R. After their marriage, Mr. M. and Katherine traveled to El Salvador to visit Iris and brought her to the United States to live with them in 1992. Although the family was originally compatible, as Iris reached adolescence, tension developed between Iris and her stepmother. An argument between them on August 8, 1994, resulted in some physical contact. Iris told her close friend, Rosemary C., of the incident, and Rosemary and her mother took Iris to the hospital for examination. A complaint of physical child abuse was lodged by Iris. After investigation, the complaint was dismissed. This incident caused a great deal of conflict within the family. As a result, the father and stepmother placed Iris in Second Mile House, a group home for adolescents. Iris spent two weeks there and, during that time, complained of physical abuse on the part of her stepmother but made no complaint of sexual abuse on the part of her father.

Iris was released from the group home to her father and stepmother on September 7, 1994. Mr. M. believed that Rosemary had induced his daughter to make a false abuse

complaint against her stepmother and, therefore, forbade his daughter from associating with Rosemary. He told Iris that he would return her to the group home if he found her in the company of Rosemary. Thereafter, while driving to work on October 20, 1994, Mr. M. saw Iris and Rosemary walking to school together; they also saw him. That afternoon, Iris and Rosemary went to the school nurse and informed the nurse that Iris had been sexually abused by her father. Iris said that her father had "tried to touch" her. She was questioned by police and the Department of Social Services (DSS) and placed in shelter care the same day. At the shelter care hearing held the next day, the allegation was described by the county attorney as "taking off her clothes, fondling her breasts, and making digital penetration." Iris was placed in shelter care by Judge Moore and parental contact with her was limited to visitation under the supervision of DSS. As a practical matter, no such visitation took place.

On November 16, 1994, a scheduled adjudication hearing was continued and the trial judge, Judge Sislen, issued an order reaffirming the commitment order and striking the order for an independent physical exam of Iris by a doctor designated by the parents. This physical exam had earlier been ordered by Judge Moore. The trial judge also denied a request by the parents to have their attorney interview Iris in the presence of her attorney.

At a motions hearing on January 9, 1995, an agreement was discussed that would temporarily settle the dispute. The attorney for Montgomery County proffered that the agreement was to the effect that Iris alleged that she had been sexually abused by her father, the father denied the allegation, and the child cannot, at the time of the agreement, return to her father's home. The trial judge, prophetically, pointed out that, while such an agreement resolved the current problem, it did not settle the major issue, *i.e.*, did the father sexually abuse the child. The judge also stated: "[I]t's going to be very hard to me to agree to a no contact, if [the father] at some point says that he wants it lifted, if there's not a finding

of abuse, frankly. Because then, I have nothing to no contact for."

When the case subsequently came on for an adjudication on February 1, 1995, the court, nevertheless, accepted the following agreement:

[T]he factual basis for finding that Iris M. to be a Child in Need of Assistance is the following:

1. On October 20, 1994, the Respondent, Iris M., alleged that her father Manuel M., would take off her clothes, fondle her breasts and put his fingers in her "private part."

2. That the Respondent's father, Manuel M., denies Iris's allegations and believes the story was fabricated.

3. That the Respondent's father, Manuel M., and Respondent's stepmother, Katherine R., are unwilling to have the Respondent return to their care and custody because of the allegations....

The father's attorney agreed to the no contact order on February 1, 1995. Shortly thereafter, the father discharged the attorney and wrote to the trial judge, stating:

I am presently in between counsel, as the result of my former attorney's failure to obtain my consent to the adjudication agreement.... I would like you to know that I told my attorney the day of the adjudication that I would not agree to an agreement with the Department unless my language was included. I was told my language was included. I have just learned it was not.... I never consented to the current adjudication agreement. What can I do?

The father's situation with respect to Iris was further affected by pending criminal charges relating to his alleged conduct toward Iris. Prior to the criminal trial, Mr. M.'s attorney advised him not to have any contact with Iris out of a fear of further fabrication on her part.

On September 29, 1995, the father appeared before Judge Leonard Ruben and entered a plea of *nolo contendere*. He

was granted a disposition under Md.Code Ann. (1957, 1996 Repl.Vol.), Article 27, § 641, of probation before judgment.

At a review hearing on November 28, 1995, the father requested visitation. The trial court, however, continued the no contact order pending an evaluation by the Child and Adolescent Forensic Evaluation Services (CAFES). Mr. M. refused to participate in the CAFES evaluation and the no contact order was continued. On January 16, 1996, the attorney for Mr. M. filed a motion to have another judge assigned to his case, and on January 22, 1996, Mr. M. filed a motion for supervised visitation. He also requested an independent family forensic evaluation. On January 31, 1996, Mr. M.'s motion for an independent evaluation was denied and an evaluation by the CAFES was ordered. On the same date, the court also modified certain no contact orders relating to Katherine R., Iris's stepmother.[1] On July 10, 1996, and July 31, 1996, review hearings were held. The no contact order prohibiting Mr. M. from having any contact with his daughter was reaffirmed on each occasion and timely appeals followed. On January 13, 1997, a further review hearing was held, the no contact order was again continued, and an appeal was filed.

## DISCUSSION

This case is an example of a terrible family tragedy that has been exacerbated by those entrusted to give aid and support. A father and stepmother have been totally separated from their daughter by the power of the State for three years, without any tangible efforts at reconciliation.

The father has appealed three no contact orders, which were issued by the District Court on July 10, 1996, July 31,

---

1. The subject orders, dated February 1, 1995, and May 5, 1995, are highly unusual. The February 1, 1995, order provides, in part: "[K]atherine [R.] ... shall not have any contact whatsoever with Iris M., Respondent, or her therapist unless contact is initiated by the therapist, news, or government officials, and no harassing contact with the social worker, or the Carroll family." On May 5, 1995, the court ordered that Katherine R. not have any contact with "any member of the County Attorney's Office and any member of the press...."

1996, and January 13, 1997. The State contends we need not consider the first two orders because they have been superseded by the order of January 13, 1997. That argument is legally correct, but we will discuss these orders to some extent where necessary, as the three orders under appeal are interrelated.

This case originated with the filing of a Petition by the Montgomery County Department of Social Services (DSS) on November 9, 1994. The petition alleged that Iris is a child in need of assistance (CINA) because she had been sexually abused by her father. The petition further stated that the father had denied inappropriate behavior and that the stepmother did not believe such behavior had occurred. It also noted that, on August 10, 1994, Iris had accused her stepmother of assaulting her, but an investigator did not substantiate the accusation and noted that Iris may have exaggerated the confrontation. After an adjudication hearing on November 16, 1994, Judge Sislen signed an order that permitted supervised visitation between Iris and her grandmother and telephone contact between Iris and Rosemary Carroll and Rosemary's mother, Susan. The order also struck the order for an independent physical examination that had been arranged by the parents and ordered by Judge Moore at the shelter care hearing on October 21, 1994. This had the effect of preventing the father from obtaining evidence that may have been essential to his defense.

The first no contact order was signed by Judge Sislen on December 2, 1994, apparently in response to a motion by DSS. The docket entries refer to such a motion, but we are unable to locate it in the court file. The order is draconian in nature in that it precludes any contact between Iris and her father and stepmother, including "no telephone contact or letter and no contact with her therapist, foster home or school." It is unfortunate that the motion requesting the order is not in the record, as it might shed light on why it was believed necessary to cut off all possible contact between Iris and her father and stepmother.

At the adjudication hearing on February 1, 1995, the parties entered into a stipulation rather than have a contested case hearing. The stipulation provided:

1. Iris alleged that her father would take off her clothes, fondle her breasts, and put his fingers in her "private part."

2. The father denies Iris's allegations and believes her story was fabricated.

3. That Iris's father and stepmother are unwilling to have Iris returned to their care and custody because of the allegations.

The stipulation, while resolving the immediate problem, did not deal with the central question, that is, did Mr. M. sexually abuse his daughter?

The issue related to the no contact order was temporarily in abeyance because the father was facing criminal charges related to Iris's complaint and his attorney advised him not to have any contact with Iris pending the resolution of those charges.

Subsequently, the father appeared before Judge Leonard Ruben, and an agreement was reached whereby he entered a plea of *nolo contendere* and, after psychological examination, received a disposition of probation before judgment under the provisions of Article 27, § 641. After the criminal charges were resolved, the father requested that the no contact order be lifted so that he could begin reconciliation efforts with his daughter.

The State avers, and we agree, that the court orders entered on January 31, 1995 and July 10, 1996 are moot. Those orders were superseded by the no contact order entered on January 13, 1997, and are, thus, meaningless. *In re Riddlemoser*, 317 Md. 496, 502, 564 A.2d 812 (1989) (a case is moot where there is no longer any effective remedy which the court can provide).

With respect to the order of January 13, 1997, Mr. M. argues that there was insufficient evidence before the court at

the January 13, 1997 hearing to afford a basis for a finding of sexual abuse. The evidence before the court was an evaluation by CAFES, an evaluation by Lawrence Smith, a therapist hired by Mr. M., and an evaluation by Susan Weigert, a clinical psychologist also hired by Mr. M.

Mr. M. points out that the CAFES evaluation cannot support a finding that sexual abuse had occurred for three reasons. First, CAFES's evaluation did not investigate whether abuse had occurred. The report provides:

> [W]e were not investigators but rather evaluating clinicians.... [T]he purpose of our assessment was not to further investigate the validity of the sexual abuse accusations, but rather to evaluate attachment issues, treatment issues and potential for reunification.

■ Secondly, it seems clear that the CAFES evaluation mistakenly concluded that a plea of *nolo contendere* and a disposition of probation before judgment was the equivalent of an admission of guilt. In *Agnew v. State*, 51 Md.App. 614, 651–653, 446 A.2d 425 (some citations omitted), *cert. denied*, 294 Md. 441 (1982), we explained the effect of a plea of *nolo contendere*:

> A plea of *nolo contendere* is, of course, an admission of guilt which can subject the defendant to the same punishment as on a plea of guilty. Maryland law concerning the use of this plea in a subsequent proceeding is scant. *See generally, McCall v. State*, 9 Md.App. 191, n. 4 at 193, 263 A.2d 19(1970), *cert. denied*, 258 Md. 729 (1970); *Comment, The Plea of Nolo Contendere*, 25 Md.L.Rev. 227, 233 (1965).
>
> \* \* \*
>
> Under the Federal Rules of Evidence, pleas of *nolo contendere* and accompanying statements are "not admissible in any civil or criminal proceeding against the person who made the plea...." Fed. Rule 410....
>
> \* \* \*

The rationale for the rule is that the plea establishes the fact of guilt only in the case to which it applies. Unlike a

guilty plea, *nolo contendere* has no effect beyond the case in which it is entered. *See Annot., Plea of Nolo Contendere,* 89 ALR2d § 37–50 at 600 (1963). Thus, the plea subsequently "does not estop the defendant to plead and prove his innocence in a civil action."

\*    \*    \*

[W]e subscribe to the majority rule that a statement made at the time of entering a *nolo* plea and the plea itself are not admissible against a party in a subsequent civil proceeding.

What the CAFES evaluators, and to some extent the trial judge, failed to take into account is that there was a significant reason for Mr. M. to enter the *nolo* plea, even if he was in fact innocent. While we are justly proud of our judicial system, it is by no means infallible. When a person goes to trial in a case of the nature facing Mr. M., he or she incurs the risk of a guilty finding regardless of how innocent he or she may be. If the prosecuting witness makes a favorable impression upon the fact finder, her testimony alone may be sufficient for a finding of guilt. The prospect of avoiding the risk of imprisonment by the entry of a *nolo* plea would have been an enormous inducement to anyone in Mr. M.'s position. This is particularly true since the entry of the *nolo* plea should not have prejudiced his civil action involving Iris and entry of probation before judgment would enable him to avoid the stigma of a criminal conviction.

Mr. M. also avers that the "fact finding" evidenced by this record shows a denial of due process to him. The parties, including Mr. M., were not permitted to read the CAFES evaluation. At the hearing on January 13, 1997, Mr. M. said in response to a question regarding the CAFES report:

I haven't ... I haven't read, that's why I didn't want to go through this because I have got all the things at the last minute, and that's ... the reason why I was going to ask if we can delay this hearing for some other day to have the time to prepare and see what the decision was going to be making, because until this point, we are making decision where we, I am not really sure. You have to make sure

you're going to be for the child's best interest, and that's the reason why we are here.

The judge responded:

COURT: You understand, you're not allowed to read the CAFES's evaluation, don't you?

[MR. M.]: No audible response.

COURT: You understand that, don't you?

[MR. M.]: Okay. I haven't read it.

COURT: Good, because it's prohibited for you to read it because of confidentiality.

It is difficult to understand how Mr. M. was expected to be able to defend himself from allegations contained in a report he was not allowed to read.

A review of the record in this case shows clearly that there has never been a proper adjudication hearing conducted and the disposition hearing was flawed because of a lack of a proper adjudication.

At the second adjudication hearing held on February 1, 1995, the court permitted the agreement referred to earlier to be the basis of its finding that Iris was a CINA. The flaw in the agreement, of course, is that it did not address the most important issue, whether the father had sexually abused Iris. The agreement, in fact, was no agreement at all. It noted that Iris made an allegation and the father denied it. It permitted the CINA finding because the father did not want Iris to return until she recanted her allegations. Notwithstanding the fact that there had been no finding of sexual abuse, the court proceeded as though there had been such a finding. The court ordered no contact between the father and Iris less than a month after the first petition was filed in this case, and that status has continued to date.

At a hearing on November 28, 1995, relating to whether the stepmother should be held in contempt, the judge stated that Mr. M. had "admitted sexually abusing Iris." The attorneys for the stepmother and the father took issue with that statement and the court responded:

Would you kindly not argue with me. The wife of a man who sexually abused Iris M., by what she said and what she said he admitted. . . .

At a review hearing on July 10, 1996, the father's attorney complained about the no contact order and proffered the report of Lawrence Smith, LCSW, who recommended supervised visitation between Iris and her father. Judge Sislen interjected:

Before you go further into the proffered testimony, I'm . . . I already found Iris to be a child in need of assistance. And, I've already found that Iris, Iris's state of mind was that she was sexually abused by Mr. M. . . . I . . . am not going to relitigate that.

When the father's attorney attempted to continue, the judge stated:

I'm not going to discuss whether or not she was sexually abused. That's over, it's a topic that I'm not going to get into.

The judge, of course, was wrong. As incredible as it may seem, the judge had decided the most contested and important issue in the case solely on reports of what the victim had said and what the judge perceived as the state of mind of the victim.

The State admits that Mr. M. sought contact with Iris after his criminal charges were settled. The court responded to Mr. M.'s request by ordering a CAFES's evaluation. Mr. M. did not wish to participate in an evaluation conducted by an arm of the State and continued to insist upon an independent evaluation. The State attempts to justify the continuation of the no contact order by averring that nothing has changed since the original no contact order. Apparently, the State is referring to the fact that Mr. M. has not admitted abusing Iris and sought counseling. This position completely overlooks the explanation that Mr. M. may not have admitted abuse because of the possibility that no abuse occurred.

The State points out that visitation is not required as a matter of law and that the right is not absolute. In addition, the court may suspend visitation when it is in the best interest of the child to do so. The "suspension" of visitation in this case has continued for three years. It would seem that there is little difference between a suspension of that length and a termination, particularly when it is still continuing.

It is extremely unusual to deny visitation of a child by the natural parent in this State. In *Radford v. Matczuk*, 223 Md. 483, 164 A.2d 904 (1960), the Court stated, "[A]n examination of the cases involving visitation rights ... discloses that this Court, even though custody was denied, has never had an occasion to deny the right of visitation to an errant parent." The State argues that the juvenile court did not err in considering Iris's wishes, but cited *In re Barry*, 107 Md.App. 206, 220, 667 A.2d 931 (1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 209, 136 L.Ed.2d 143 (1996), wherein this Court criticized the judge for leaving the decision as to visitations to the "unfettered discretion" of five-year-old children.[2] As in *Barry*, Judge Sislen also gave Iris the power to veto any visitation. At a hearing on November 28, 1995, the judge stated, "And, I darn well ... am going to honor this child's request not to see her father." Iris, at that time, was almost fifteen years old, an age when her wishes would carry significant weight. She should not, however, be the sole determinant. In *Radford*, 223 Md. at 491, 164 A.2d 904 (a visitation case), the Court of Appeals stated: "[T]he desire of an intelligent child, who has reached the age of discretion, should be given some consideration in determining custody, but even in a custody case the wish is not controlling."

Another aspect of this case we find troubling is that, apparently, no effort has been made toward reunification of this family. Although almost every order signed by the judge relative to the child contains the pre-printed language "despite reasonable efforts having been made to have said child re-

---

2. *Barry*, incidentally, was an appeal from the same judge presiding in this case.

turned to her home," there does not appear in the record evidence of any real efforts toward that goal. At a chambers conference on April 24, 1996 involving counsel for the parties, the following was said:

> MR. McCARTHY: The permanent plan right now, I mean we're heading towards, although the plan is I guess officially reunification, right now . . .
>
> COUNTY [ATTORNEY]: No, the plan is not reunification.
>
> MS. SHARMAN [DSS]: Not reunification.
>
> MR. McCARTHY: Oh, its not reunification?
>
> MS. SHARMA: No.

■ It is, therefore, clear why the record is devoid of efforts made toward reunification. It was not a goal of DSS, although it should have been. The policy of this State is explained in *Ross v. Hoffman*, 280 Md. 172, 177, 372 A.2d 582 (1977):

> Nevertheless, there persists in this State in a contest over the custody of a child, but always subject to the best interest standard, that part of the common law concept which declares that the right of either parent is ordinarily superior to that of anyone else.

■ And, as this Court, speaking through then Chief Judge Wilner, stated in *In re Barry E.*, 107 Md.App. at 207, 667 A.2d 931:

> The fact that appellant has a mental or emotional problem and is less than a perfect parent or that the children may be happier with their foster parents is not a legitimate reason to remove them from a natural parent competent to care for them in favor of a stranger.

This case went awry from the outset by the court's entry of a "no contact" order that completely cut off the father from his child. That situation, unfortunately, remains unchanged three years later.

At the hearing on January 13, 1997, the father attempted to articulate his concerns:

> Q. Now, Ms. Weigert is recommending that a trial of family therapy begin with your therapist and with Iris's therapist, is that correct?
>
> A. Yes. I have been ... thinking about that really strongly, in that I think we cannot have a better relationship if the Court doesn't allow me to lift the no contact order, and that's what's hurting a lot of family, and hurting the child. We are looking for the best interest for the child, this Court, I have to please listen and lift the no contact order, because this is stacking a wall between us. We cannot break it. If we don't break the wall, we are never going to go anywhere.

The State attempts to justify the existence of the no contact order by alleging that Mr. M. has failed to obtain therapy to treat his status as a sex offender. What the State disregards is the fact that Mr. M. has never admitted to a sex offense and the court has not found that he has committed a sex offense. It is not unreasonable for Mr. M. to decline such treatment if he did not commit the offense. The District Court, however, proceeded in the case as though he was in fact guilty.

We, of course, have no knowledge of whether he is guilty. The record contains a report from Ms. Weigert, the clinical psychologist hired by Mr. M., that indicates that there is a strong possibility that the charges were fabricated. The only evidence pointing to his guilt is the child's complaint.

■ As recognized by the trial judge early on, but then disregarded, the existing evidence did not justify a no contact order. To cut off a parent totally from his or her child is an extraordinary step and should only be taken for the most compelling reasons and on clear evidence. The court should have known that this case did not warrant such an extraordinary step. The greatest restriction that should have been placed upon the father was supervised visitation until the issue of sexual abuse had been determined.

We are remanding this case to the District Court for Montgomery County, Juvenile Division, with instructions to strike the no contact order and order DSS *promptly* to set up

a liberal supervised visitation schedule between Iris and her father. The court should also instruct DSS to take its responsibility to attempt a reconciliation between Iris and her father seriously. We suggest that Ms. Weigert be consulted on how this could best be accomplished.

We realize that, after so much time has elapsed, the separation of this family is now an accomplished fact and a reconciliation may now be impossible. We owe it to this family, however, to make a reasonable effort.

**NO CONTACT ORDERS VACATED.**

**CASE REMANDED TO THE DISTRICT COURT OF MARYLAND FOR MONTGOMERY COUNTY, JUVENILE DIVISION FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY MONTGOMERY COUNTY.**