**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1845

September Term, 2014

IN RE: ANDRE J.

Woodward,
Kehoe,
Arthur,

JJ.

Opinion by Arthur, J.

Filed: June 1, 2015

In 2003, when he was eight years old, Andre J. was found to be a child in need of assistance (CINA)[1] and removed from his mother's care and custody. He has remained in foster care since that time. When Andre was 19 years old in 2014, the Circuit Court for Montgomery County, sitting as a juvenile court, issued an order changing his permanency plan from reunification with his mother to another planned permanent living arrangement (APPLA). Andre's mother appeals from that order and asks: "Did the court err by changing Andre's plan from a sole plan of reunification to a sole plan of APPLA?" For the reasons that follow, we answer in the negative and affirm the order of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Andre's Family Background and CINA Determination

Andre J. was born in December 1994. Ms. Amanda G. ("Ms. G.") is Andre's biological mother. The identity of Andre's father is unknown. Between 1996 and 1999, Ms. G. gave birth to four children (two half-sisters and two half-brothers of Andre).

From his mother, Andre inherited Fragile X syndrome, a genetic condition that causes significant intellectual disabilities, particularly among males. Andre's full-scale IQ has been measured as 42. His diagnoses include pervasive developmental disorder,

_____

[1] The term "child in need of assistance" or "CINA" means "a child who requires court intervention because: (1) [t]he child has been abused, neglected, has a developmental disability, or has a mental disorder; and (2) [t]he child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." Md. Code (1974, 2013 Repl. Vol.), § 3-801(f)-(g) of the Courts and Judicial Proceedings Article.

communication disorder, and separation anxiety disorder. His mother and his two younger brothers also have special needs.

In 2003, the Montgomery County Department of Health and Human Services ("the Department") received a report of neglect. An investigation revealed that Andre and his siblings lacked adequate food, clothing, furnishings, and supervision in Ms. G.'s home.

On the basis of that investigation, the Department filed a petition in the Circuit Court for Montgomery County sitting as juvenile court, alleging that Andre and his siblings had been neglected by their mother, and that she was unable to give proper care and attention to the needs of her children. The petition stated that Ms. G. appeared to have limited cognitive abilities and that she lacked basic parenting skills. The Department proved the allegations, and the court adjudicated Andre and his four siblings as children in need of assistance.

Andre, who was eight years old at the time of the CINA determination, was committed to the custody of the Department and placed in specialized foster care apart from his siblings. The court established a permanency plan of reunification with Andre's mother and, to that end, granted her liberal visitation. After evaluating Ms. G., the Department recommended that Andre's maternal grandmother, Ms. Carolyn A. ("Ms. A."), should serve as the primary care provider, because Ms. G. would probably be able to

function only "as a supportive, secondary maternal figure to her children."[2]

In October 2003, Andre was placed in a therapeutic foster home in Gaithersburg, Maryland. Since that time, Andre has resided with his foster mother, a special education teacher. Andre reportedly made an excellent adjustment to foster care. His functioning has consistently improved with the assistance of medication monitoring, a stable environment, and structured daily routine.

**B.** **Evolution of Andre's Permanency Plan**

In accordance with statutory requirements, Andre's permanency plan was reviewed every six months. *See* Md. Code (1974, 2013 Repl. Vol. & 2014 Supp.), § 3-823(h)(1) of the Courts and Judicial Proceedings Article ("CJP"). As circumstances evolved, the court modified Andre's permanency plan and visitation schedule several times.

In 2004, Ms. G. relocated to Washington, D.C. Soon thereafter, the court changed Andre's permanency plan to placement with a relative (Ms. A.) for custody and

---

[2] Reports from the Department indicate that Ms. G.'s full-scale IQ is 56 and that Ms. A.'s full-scale IQ is 71. An IQ score of 70 or below, approximately two standard deviations below the mean, is one of the major criteria for the diagnosis of intellectual disability. The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) classifies intellectual disabilities according to the severity of the person's adaptive functioning. Although IQ is not the sole determinant, individuals with an IQ between 55 and 70, such as Ms. G., typically fall within the "mild" range. Persons such as Andre, with an IQ between 40 and 55, typically fall within the "moderate" range. Many adults with mild intellectual disability are capable of gaining employment and living independently with only intermittent support. Because adults with moderate intellectual disability have comparatively greater limitations on their communication and self-help skills, they often require more extensive support at home.

guardianship. The court's order stated that Ms. G. would reside with Ms. A. so that Andre and his siblings would "have the added benefit and security of both caretakers." In 2006, however, the court ordered that the permanency plan be changed to APPLA, because Andre's "mother and grandmother are cognitively limited and are unable to discern the needs of [Andre] and his siblings."

In 2008, Andre's two younger sisters were reunified with their mother. At that time, Ms. G. was receiving extensive services through the Department on Disability Services (DDS), an agency in Washington, D.C., while Ms. A. continued to provide ongoing support to her grandchildren. In 2009, the court approved a new permanency plan for Andre of reunification and a concurrent plan of APPLA.

In 2010, the court authorized monthly unsupervised visitation for Andre and his mother. After his unsupervised visits, however, Andre began to exhibit unsafe behaviors, including an attempt to jump out of a moving vehicle. He was hospitalized and treated for stress-induced anxiety attacks. In an emergency order, the court required that Andre's visits with his mother be supervised.

Although the Department requested that the court change Andre's permanency plan to a sole plan of APPLA at that time, the court re-authorized the concurrent plan of reunification and APPLA. The court reaffirmed that plan until 2012, when it changed the plan to a sole plan of reunification.

**C.** **Efforts to Achieve Reunification Before Andre's Twenty-First Birthday**

After Andre reached the age of 18 in December 2012, the court continued to order that Andre remain a CINA under the court's jurisdiction. Because the CINA proceeding would terminate when Andre turned 21 (CJP § 3-804(b); *see also* CJP § 3-819(k)), the Department began a more aggressive push to prepare for a transition out of the foster care system. The primary goal was to return Andre to his mother in Washington, D.C., before his twenty-first birthday. As a last resort, the Department also began to explore the possibility of placing Andre in an adult male group home through Maryland's Developmental Disabilities Administration (DDA).

The Department engaged DDS, the District of Columbia agency that had been providing services to Ms. G. in Washington, to request that support services be put in place prior to Andre's relocation. This partnership was not successful. DDS indicated that Andre would be ineligible for services until he became a full-time resident of the District of Columbia, a process that would take between 90 and 120 days. Furthermore, even after Andre established residency, there would be an additional period of delay before Andre could receive his full service plan, and his eligibility could not be guaranteed.

Around the same time as these outreach efforts, DDS dramatically reduced its level of services to Ms. G., deeming her to have increased her level of independence. Ms. G.'s long-time service coordinator also left DDS, and her replacements were less reliable than the former employee had been in coordinating with the Department.

In an attempt to bridge a possible service gap, the Department focused its efforts on improving Ms. G.'s ability to handle Andre's more challenging behaviors. Although Andre was more mature and better able to communicate than he had been in the past, Andre often needed behavioral interventions from adults to help him complete daily tasks. Even more important, Andre still required constant supervision to protect against threats to his safety (*e.g.*, threats from crossing the street without looking or touching hot objects).

The established visitation schedule included a supervised monthly visit with Ms. G. at her home in Washington and a supervised monthly visit with Ms. G. and with Andre's brothers at a visitation house in Maryland. To help the Department assess Ms. G.'s ability to meet Andre's needs, the court modified the visitation schedule to include a full-day, lightly supervised visit at the mother's home, as well as an optional Saturday visit.

Both Ms. G. and Andre, however, began to avoid the contact necessary to make progress toward reunification. Ms. G. frequently declined the opportunity for weekend visits with Andre. Family visitation in Maryland was inconsistent because Ms. G. often was extremely late for scheduled visits, cancelled at the last minute or after the visit was scheduled to begin, or did not show up at all. Andre began to display anger towards his mother during and after visits.

Andre also started to verbalize his trepidation about moving to Washington. He

became even more resistant after the court authorized unsupervised visits at Ms. G.'s home in March 2014. Andre became extremely upset during his second unsupervised visit, and then he completely refused any further visits to Washington, no matter what conditions were put in place to help him overcome his anxiety.

**D.**     **Change in Permanency Plan to Eliminate Goal of Reunification**

On October 13, 2014, less than two months before Andre's twentieth birthday, the Department issued a report recommending that Andre's permanency plan be changed from reunification to APPLA. The report cited Ms. G.'s history of missing scheduled visits, Andre's increasing frustration with that inconsistency, Andre's refusal to travel to Washington for visits, and Andre's preference to remain in Maryland. The Department took the position that it had exhausted efforts to achieve reunification: partnering with DDS to implement a service plan for Andre in Washington was no longer a viable option, and Ms. G.'s limitations were too severe to enable a safe transition without those supports.

In short, the Department concluded: "The time and work that still needs to be done for [reunification] to become a possibility far exceeds the amount of time Andre has left" in the child welfare system. The Department recommended that it was in Andre's best interest to focus immediately on working with Maryland's DDA to develop an individualized plan of residential, day programming, and support services for Andre after he would leave foster care.

The Department argued its position at a permanency plan review hearing on October 23, 2014. A licensed graduate social worker recounted the case history and explained the reasons for the Department's recommendations. Andre's court-appointed special advocate voiced further support for the change in permanency plan. Andre, through his attorney, also agreed with the Department's position.

The court consulted with Andre on the record to obtain his views on permanency. When the court asked Andre for his "thoughts on staying in Maryland, as opposed to going down to D.C.," he answered: "No. Maryland's okay." When asked specifically about his thoughts about moving to Washington, Andre said: "It's going to be hard." Andre confirmed that he had not visited Washington since the previous review hearing.

Ms. G. also testified at the hearing. Through her attorney, Ms. G. opposed any change in permanency plan. She argued that Andre's reluctance to move to Washington simply resulted from his desire to avoid change. She further argued that, because it was inevitable that Andre would need to leave his foster home anyway, it was in Andre's best interest to return to his biological family rather than to be placed in a group home.

Counsel also suggested that the Department should try once more to make Andre eligible to receive support services in Washington. The court responded, "we've been trying that for about five years . . . and we have never gotten anywhere with D.C."

Ruling from the bench, the court explained that it would change Andre's permanency plan from reunification to APPLA. As a "critical reason" for the plan

change, the court cited the need to "start now to find an appropriate place for Andre" after he reached the age of 21. The court commented that it had "absolutely no confidence in D.C. DDS," and that the Maryland DDA would need time to set up the appropriate placement for Andre. The court further explained that it was "not going to just ignore" Andre's stated preference, because Andre had "gone down to D.C." and he had "come to understand what that feels like."

In a written order entered on October 24, 2014, the court ordered that Andre continue to be a CINA committed to the Department; that Andre's permanency plan should change to APPLA; that Andre be co-committed to the DDA to facilitate a transition when Andre turned 21; and that the Department explore options for a future guardianship and placement after Andre's twenty-first birthday. The court also modified the visitation schedule, ordering only one monthly visit with Andre's brothers in Maryland.

Ms. G. has appealed from the court's order. Both the Department and Andre, through his attorney, filed briefs asking that the order be affirmed.

<u>**MOTION TO DISMISS**</u>

The Department has moved to dismiss this appeal (*see* Md. Rule 8-602(a)) on the grounds that no appeal is authorized by statute. The Department contends that the juvenile court's order is neither a final judgment nor an appealable interlocutory order.

In general, the right of appeal exists from a final judgment entered by a circuit

-9-

court in a civil case. CJP § 12-301. Parties are also authorized to take immediate appeals from certain categories of orders that are not final. Of central importance here, "[a] party may appeal from . . . [a]n order . . . [d]epriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order." CJP § 12-303(3)(x).

In view of § 12-303(3)(x), many "orders of court regarding permanency plans are immediately appealable" "despite their interlocutory nature." *In re Yve S.*, 373 Md. 551, 583 (2003) (citation omitted). To be immediately appealable under CJP § 12-303(3)(x), "'court orders arising from the permanency plan review hearing must operate to either deprive [a parent] of the care and custody of her children or change the terms of her care and custody of the children to her detriment.'" *In re Karl H.*, 394 Md. 402, 428 (2006) (quoting *In re Billy W.*, 387 Md. 675, 691-92 (2005)).

In *In re Damon M.*, 362 Md. 429 (2001), the Court of Appeals held that a parent could immediately appeal from an order changing a permanency plan from reunification to a plan of foster care or adoption. *Id.* at 438. The Court explained that, even though the permanency plan does not constitute a final custody determination, the amendment of a permanency plan from reunification with a parent amounts to a change in the terms of the custody order. *Id.* at 437.

> The permanency plan . . . provides the goal toward which the parties and the court are committed to work. It sets the tone for the parties and the court and, indeed, may be outcome determinative. . . .

> It is true, of course, that a parent will have lost custody before a permanency plan will have been developed. Nevertheless, once determined, . . . the permanency plan sets out the anticipated permanent placement, to the achievement of which the "reasonable efforts[]" . . . must and will be directed . . . . [W]hen the plan is reunification, there necessarily is, on the part of the court and, certainly, the parent, an expectation – more than a hope – that the parent will regain custody. That is, after all, the point of the plan . . . .

*Id.* at 436-37.

Maryland courts have consistently held that an order changes the terms of a child's care and custody to the detriment of the parent, and thus is immediately appealable, when it includes a substantial departure from the goal of reunification. *See In re Ashley S.*, 431 Md. 678, 702 n.15 (2013) ("[a] change in a permanency plan to eliminate reunification with a parent is appealable as an interlocutory order"); *In re Adoption/Guardianship of Cross H.*, 431 Md. 371, 373 n.1 (2013) (reasoning that order changing plan from reunification with parent to non-relative adoption would be appealable because it would "extinguish the expectation of regaining custody"); *In re Joseph N.*, 407 Md. 278, 291-93 (2009) (holding that mother could appeal order reaffirming permanency plan of reunification while shifting physical custody from foster care to father, because order "represented a meaningful shift in direction vis a vis [mother], and possible restoration of her rights as a parent"); *In re Karl H.*, 394 Md. at 430-31 (holding that a concurrent plan established at initial permanency hearing "that includes the option of adoption is sufficiently far enough along the continuum of depriving a parent of a fundamental right

[so that it] is immediately appealable"); *In re Joy D.*, 216 Md. App. 58, 73 n.10 (2014) (order waiving requirement that local department make reasonable efforts to reunify parent with child is appealable); *In re James G.*, 178 Md. App. 543, 564-65 & n.14 (2008) (order changing plan from reunification with parent to placement with relative is appealable).

The Department nonetheless contends that Ms. G. has no right to appeal because her child has reached the age of 18. The Department asserts that "the plan change did not diminish Ms. G[.]'s custodial rights because Andre is an adult, and a parent has no custodial rights to an adult child." Further, the Department theorizes that Ms. G. may "establish custody over her adult child" only by first petitioning for guardianship of Andre as a disabled adult. For several reasons, we reject the argument that the juvenile court's order did not change the terms of Andre's care and custody to Ms. G.'s detriment.

As used in the Maryland Code, the term "'[a]dult' means an individual at least 18 years old." Md. Code (2014), General Provisions Art., § 1-103(a). The term "'minor' means an individual under the age of 18 years." *Id.* § 1-103(b) Standing on its own, however, the term "child" contains no age restriction. *See id.* § 1-106 (definition providing that the term "child" generally includes illegitimate children, but establishing no age restriction). For this reason, statutes will often refer to a "minor child" when describing a parent's relationship with a child who is under the age of 18, and to an "adult child" when describing a parent's relationship with a child over the age of 18. *Compare*

-12-

Md. Code (1984, 2012 Repl. Vol.), § 5-203(a) of the Family Law Article ("FL") (providing that "parents are the joint natural guardians of their minor child"), *with id.* § 13-102(b) (establishing parent's financial obligation to support a "destitute adult child").

We are unconvinced that the appellate jurisdiction conferred by CJP § 12-303(3)(x) is limited to orders affecting the care and custody of minors. The language of this particular provision is not limited to an order involving a "minor child"; rather, it speaks of an order depriving a parent of "the care and custody of his child." Nor is the term "child" otherwise restricted within the Courts and Judicial Proceedings Article (*see* CJP § 1-101), or within the title that governs appeals. *See* CJP § 12-101.

Moreover, Andre belongs to a small category of adults under the age of 21 who are still considered to be "children" for the purposes of the juvenile court's CINA jurisdiction. Within the CINA subtitle, the term "child" generally refers to persons under 18. *See* CJP § 3-801(e). As an exception, however, once the court obtains jurisdiction over the child, "that jurisdiction continues in that case until the child reaches the age of 21 years, unless the court terminates the case." CJP § 3-804(b); *see also* CJP § 3-819(k) ("[a]n order vesting legal custody of a child in a person or agency is effective for an indeterminate period of time, but is not effective after the child reaches the age of 21"). Consequently, even though Andre was 19 years old at the time of the order, he was still

deemed to be a child in need of assistance subject to juvenile court jurisdiction.[3]

In the exercise of that jurisdiction, the juvenile court's order made a number of changes to the terms of Andre's care and custody. By ordering that Andre be co-committed to the DDA, the court transferred custody to a new entity. *See* CJP § 3-801(h) ("'Commit' means to transfer custody"). The court also ordered the Department to pursue a guardianship for Andre after he reached 21 years of age. The order thereby created a new expectation that some person or entity other than Andre's mother would exercise custodial rights in the future.

The order also reduced Ms. G.'s visitation rights. The previous review hearing order had entitled Ms. G. to full-day, unsupervised visits in her home each month, with the option of an additional supervised weekend visit each month. The new order eliminated those visits, maintaining only one visit for two hours each month with Andre's younger brothers at a Maryland visitation house. Pursuant to CJP § 12-303(3)(x), an order that modifies visitation to a parent's substantial detriment is also appealable. *See In re Billy W.*, 387 Md. 405, 425-26 (2005) (holding that mother could immediately appeal

---

[3] Andre was also a "child" under the regulations that govern Maryland's out-of-home placement programs, which include foster care through a local department of social services. Those regulations define a "child" as "an individual younger than 18 years old, or between 18 and 21 years old if the court retains jurisdiction over the child and the individual meets [] eligibility requirements[.]" COMAR 07.02.11.03(10). Andre remained eligible for out-of-home placement, because he was then completing a secondary education program at Gaithersburg High School. *See* COMAR 07.02.11.04(B).

order that eliminated unsupervised visitation because it infringed upon mother's "opportunities to interact with, and care for, the [children] and to potentially build stronger relationships with them[,]" and also holding that father could immediately appeal order that required that the father hire an off-duty police officer to supervise visitation, because that restriction "constitute[d] a detrimental change in [the father's] visitation rights").

In determining whether an order affecting care and custody is immediately appealable, "the focus should be on whether the order[,] and the extent to which that order[,] changes the antecedent custody order." *In re Karl H.*, 394 Md. at 430; *see In re Katerine L.*, 220 Md. App. 426, 440 (2014). The reunification plan created a justifiable expectation that the Department would make efforts to reunify Ms. G. with her adult child, and it mandated unsupervised and supervised visits to help achieve that goal. The revised plan eliminated the goal of reunification, established that the Department would pursue a permanent adult guardianship for Andre with the DDA, and drastically reduced Ms. G.'s visitation rights.

In sum, the juvenile court's order changed the terms of Andre's custody and visitation (and had the potential to determine the outcome of his future custody) in a way that detrimentally affected his mother's existing rights. Even though Andre is more than 18 years old, Ms. G. may appeal from this interlocutory order, because it is an order "[d]epriving a parent . . . of the care and custody of [her] child, or changing the terms of

such an order." CJP § 12-303(3)(x).[4]

**DISCUSSION**

**A.      Standard for Reviewing Change of Permanency Plan**

In cases where a child in need of assistance has been placed outside of the family

home, the juvenile court must determine a permanency plan consistent with the child's

best interests.  *See* CJP § 3-823(b).  The court must consider the following factors in

selecting the plan:

> (i) the child's ability to be safe and healthy in the home of the
> child's parent;
>
> (ii) the child's attachment and emotional ties to the child's
> natural parents and siblings;
>
> (iii) the child's emotional attachment to the child's current
> caregiver and the caregiver's family;
>
> (iv) the length of time the child has resided with the current
> caregiver;
>
> (v) the potential emotional, developmental, and educational

---

[4] The Court of Appeals has commented that one purpose of permitting immediate appeals under CJP § 12-303(3)(x) is to safeguard a parent's natural rights, which have constitutional dimensions.  *See In re Samone H.*, 385 Md. 282, 299-300 (2005); *Frase v. Barnhart*, 379 Md. 100, 117-18 (2003).  Here, the prior permanency orders vested Ms. G. with certain rights to the care and custody of Andre.  Under these circumstances, it would be both unnecessary and unwise to address whether Ms. G. also possessed any "natural" or "fundamental" right to direct Andre's upbringing after he reached the age of 18.  *See Sumpter v. Sumpter*, 436 Md. 74, 91-92 (2013) (avoiding potential issue regarding mother's constitutional interest in the care and custody of her children and invoking well-settled principle that courts should not decide a constitutional issue when a non-constitutional ground presents itself).

-16-

harm to the child if moved from the child's current placement; and

(vi) the potential harm to the child by remaining in State custody for an excessive period of time.

FL § 5-525(f)(1); *see also* CJP § 3-823(e)(2).

"In developing a permanency plan, the juvenile court is to give primary consideration to the 'best interests of the child.'" *In re Ashley S.*, 431 Md. at 686. Another major purpose of the CINA statute, however, is to "conserve and strengthen the child's family ties and to separate a child from the child's parents only when necessary for the child's welfare[.]" CJP § 3-802(a)(3). To this end, "[t]he statutory scheme presumes that, 'unless there are compelling circumstances to the contrary, the plan should be to work toward reunification, as it is presumed that it is in the best interest of a child to be returned to his or her natural parent.'" *In re Joy D.*, 216 Md. App. at 74-75 (quoting *In re Yve S.*, 373 Md. at 582).

The court must consider the following hierarchy of placement options, in descending order of priority: (1) reunification with the child's parent or guardian, (2) placement with a relative for adoption or custody and guardianship, (3) adoption by a nonrelative, (4) custody and guardianship by a nonrelative, or (5) "[a]nother planned permanent living arrangement that . . . [a]ddresses the individualized needs of the child, including the child's educational plan, emotional stability, physical placement, and socialization needs; and . . . [i]ncludes goals that promote the continuity of relations with

individuals who will fill a lasting and significant role in the child's life." CJP §

3-823(e)(1)(i). The court may not continue a child's out-of-home placement under a plan

of APPLA "unless the court finds that the person or agency to which the child is

committed has documented a compelling reason for determining that it would not be in

the best interest of the child" to pursue other permanent placement options. CJP §

3-823(f).[5]

"Once set initially, the goal of the permanency plan is re-visited periodically at

hearings to determine progress and whether, [because of] historical and contemporary

circumstances, that goal should be changed." *In re Yve S.*, 373 Md. at 582. At review

hearings, the court must "[c]hange the permanency plan if a change in the permanency

plan would be in the child's best interest." CJP § 3-823(h)(2)(vi); *see also In re Adoption

of Cadence B.*, 417 Md. 146, 157 (2010) ("if there are weighty circumstances indicating

that reunification with the parent is not in the child's best interest, the court should

modify the permanency plan to a more appropriate arrangement") (citation omitted).

In this appeal, Ms. G. does not contend that the court erred in any of its factual

---

[5] More specifically, CJP § 3-823(f) requires a showing of a compelling reason that it would not be in the child's best interest to: (1) return home; (2) be referred for termination of parental rights; or (3) be placed for adoption or guardianship with an appropriate relative or guardian. Here, the court's order documented the Department's "compelling reasons" not to pursue any of these options, and this appeal focuses on the reasons why it was not in Andre's best interest to return home.

findings or legal conclusions.[6]  Instead, she challenges the court's ultimate exercise of discretion in changing Andre's permanency plan.  *See Cadence B.*, 417 Md. at 155 (where parent challenges ultimate decision to change permanency plan rather than any findings of fact, appellate court must determine whether juvenile court abused its discretion); *In re James G.*, 178 Md. App. at 565 n.14 ("[a]n order changing a permanency plan is subject to overall review for abuse of discretion") (citing *In re Yve S.*, 373 Md. at 583).

In this context, an abuse of discretion exists "where no reasonable person would take the view adopted by the [trial] court, or when the court acts without reference to any guiding rules or principles." *In re Yve S.*, 373 Md. at 583 (citation and quotation marks omitted).  A trial court's exercise of discretion in changing a permanency plan will be reversed if the court's decision is "'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Cadence B.*, 417 Md. at 155-56 (quoting *In re Yve S.*, 373 Md. at 583-84).

Here, the court summarized the basis for its decision in its written order:

> [I]t is in Andre's best interest to change the plan to APPLA. Previous attempts to engage D.C. [DDS] in planning for Andre have been unsuccessful.  He has expressed a desire to remain in Maryland and does not wish to relocate to the District of Columbia.  Given his age and his ability to express

---

[6] Maryland appellate courts apply three different standards of review to different aspects of a court's decision in child custody cases: we scrutinize factual findings for clear error; we determine whether the juvenile court erred as to matters of law and if so whether those errors were harmless; and then we evaluate the juvenile court's ultimate decision for abuse of discretion.  *See In re Shirley B.*, 419 Md. 1, 18 (2011) (quoting *In re Yve S.*, 373 Md. at 586).

himself, the Court gives considerable weight to his stated wishes. In addition, efforts need to begin now to transition Andre into a safe and appropriate environment as he nears the age of 21.

As to the "compelling reasons" for placement under APPLA, the court stated:

[I]t is not in the best interest of the Child to be returned home because the limitations of both Andre and Ms. G. are too severe to realistically continue to pursue a plan of reunification. Reunification efforts have been considerable over the past several years and have not proved fruitful.

B.    **Consideration of Child's Views on Permanency**

Ms. G.'s appeal focuses on one aspect of the court's reasoning. She contends that "Andre's preference not to move to [Washington] should not have been dispositive or given significant weight." She argues that Andre could not form a rational judgment on the issue of permanency. In support, she refers to a report that had been submitted in connection with the previous review hearing, in which a court-appointed special advocate expressed concern that Andre might not have understood that, under any arrangement, he could not stay in his foster home after reached the age of 21.

Andre, through his attorney, argues that the juvenile court appropriately considered his preference not to move to Washington. The Department contends that the court was not only permitted to consider Andre's views on the permanency plan, but was in fact required to do so.

At least every 12 months, at a permanency planning review hearing, the court "shall consult on the record with the child in an age-appropriate manner to obtain the

child's views on permanency." CJP § 3-823(j)(1). With respect to matters of both custody and visitation, this Court has held that "'[w]hen a child is of sufficient age and has the intelligence and discretion to exercise judgment as to his or her future welfare, based upon facts and not mere whims, those wishes are one factor that, within context, should be considered by the trial judge . . . .'" *In re Barry E.*, 107 Md. App. 206, 220 (1995) (quoting *Leary v. Leary*, 97 Md. App. 26, 48 (1993)); *see also In re Iris M.*, 118 Md. App. 636, 648 (1998) (explaining that wishes of child who was almost 15 years old and who requested not to have visitation with her father should be given some consideration, but should not be the sole determinant of visitation decision).

In addressing whether it was appropriate for the court to consider Andre's preference, we acknowledge that the trial court "'is in the unique position to marshal the applicable facts, assess the situation, and determine the correct means of fulfilling a child's best interests.'" *In re Karl H.*, 394 Md. at 415 (quoting *In re Samone H.*, 385 Md. 282, 301 (2005)). Despite his cognitive and verbal deficits, Andre was nearly 20 years old when he testified at the hearing. The trial judge had the opportunity to observe Andre and to assess his affect. After Andre's testimony, the court-appointed special advocate commented: "He has come a long way, and I'm so impressed with how he can express his emotions . . . and thoughts clearly." A report from the Department's assigned social worker, who had extensive familiarity with Andre's development, stated: "Though [Andre's] comprehension around this [issue] may be fragmented and loose, he is

-21-

distinctly aware that he feels more support in Maryland rather than D.C." Moreover, the case history revealed a consistent, longstanding pattern of distress during and after Andre's unsupervised visits with his mother in Washington. The court here reasonably concluded that Andre's preference not to move to Washington was sufficiently intelligent and more than a mere whim.

### C. Consideration of Other Factors

In any event, the trial court did not, as Ms. G. asserts, consider only Andre's "present desires" without considering "his future needs." To the contrary, Andre's preference was neither the sole factor nor the predominant factor in the court's decision. The overriding consideration that properly informed the court's determination was Andre's "ability to be safe and healthy in the home of [Andre's] parent." FL § 5-525(f)(1)(i). The Department here made extensive efforts for several years to ensure that Andre would be safe in Ms. G.'s home in Washington, but the limitations of Andre and his mother, in combination with the unavailability of support services, made that goal impossible to achieve.

The Court of Appeals has emphasized that, in deciding a permanency plan for a child who has been declared a CINA because of a parent's abuse or neglect, the court should remain mindful that custody may not be granted to the parent unless the court makes a specific finding that there is no likelihood of further abuse or neglect in the parent's custody. *See In re Shirley B.*, 419 Md. 1, 21-22 (2011) (citing FL § 9-101); *In re*

*Yve S.*, 373 Md. at 587-88 (explaining that this requirement "focuses the court's attention and gives clear direction in the exercise of [the court's] discretion"). Furthermore, "[t]he previously abusive or neglectful parent shoulders the burden of proving that the past conduct will not likely be repeated." *Cadence B.*, 417 Md. at 157.

In *Cadence B.*, the child was found to be a CINA as a result of the neglect of her father, who also had a proven history of neglectful conduct towards his five other children. *Id.* at 149. The Court of Appeals held that the juvenile court did not abuse its discretion in changing Cadence's permanency plan from reunification to adoption after she had spent over a year and the majority of her life in foster care. *Id.* at 149-50. The Court highlighted testimony that "any path to reunification would require a gradual increase in the hours of permissible visitation so that the Department could monitor the interactions until it was satisfied that Cadence would be safe in her father's custody." *Id.* at 163. The father, however, participated infrequently in visitation despite the local department's efforts to facilitate more frequent visits. *Id.* Similarly here, Ms. G.'s poor record of attending scheduled visits in Maryland, and her choice not to attend optional weekend visits, made it unlikely that Ms. G. would make the necessary progress toward reunification within any time frame consistent with Andre's welfare.

In determining Andre's permanency plan, the court was also required to consider Andre's attachment and emotional ties to his natural parent and siblings. *See* FL § 5-525(f)(1)(ii); CJP § 3-823(e)(2). With respect to this factor, the court noted: "Andre

has connections to biological family, but these are superficial and fragmented at best. . . . Andre sees his brothers once a month, regardless of whether Ms. G. visits or not." These considerations properly guided the court's ultimate decision to eliminate the goal of reunification. *See In re Ashley S.*, 431 Md. at 717 (in opinion affirming change of permanency plan from reunification to adoption, noting that emotional ties between mother and children "were weakened substantially by [the mother's] failure to arrive at visitation appointments on time – if she arrived at all").

Nonetheless, even if the lack of progress towards reunification could not be attributed to any failing of Ms. G., the central issue for the court remained whether Andre in fact would ever be safe in Ms. G.'s care. *See In re Shirley B.*, 419 Md. at 33-34. In *Shirley B.*, four children, each of whom had special needs, were found to be CINA upon proof of abuse and neglect by their parents. *Id.* at 5-6. Over a period of 28 months, the local department made efforts to connect the mother with services to meet her individualized needs, but the funding for most of the recommended services was not available. *Id.* at 6. The Court of Appeals acknowledged that the mother had been "largely cooperative" with the local department and that the mother's "inability to improve her situation" was "arguably through no fault of her own[.]" *Id.* at 33.

Nevertheless, the Court reasoned that the statute requires the courts to "balance [the mother's] interests with the [c]hildren's health and safety." *Id.* at 33-34 (citing FL § 5-525(f)(1)(i)). The Court held that the juvenile court did not abuse its discretion in

changing permanency plans of the children from reunification for adoption, because the mother's cognitive "limitations prevented her from providing a safe home for her children in the foreseeable future[.]" *In re Shirley B.*, 419 Md. at 7. For similar reasons, we conclude here that changing Andre's permanency plan to another planned permanent living arrangement suited to his special needs and circumstances was a choice well within the bounds of the court's discretion.

As a final objection, Ms. G. complains that the permanency plan of APPLA failed to include sufficient "goals that promote the continuity of relations with individuals who will fill a lasting and significant role in the child's life[.]" CJP § 3-823(e)(1)(i)(5). Ms. G. argues that only Andre's biological family, and not his present care providers and mentors, would fill any role in Andre's life after he would age-out of the child welfare system in December 2015.

The court, however, did seek to preserve meaningful contact with Andre's family. In stating the compelling reasons for the plan of APPLA, the court's order specifically found that it was not in Andre's best interest to terminate Ms. G.'s parental rights, "because Andre and Ms. G. do have a connection that should be preserved." The court continued to order monthly visits for Andre with his mother and his two brothers at a visitation house in Maryland and also ordered the Department to pursue the availability of "food vouchers" to aid those visits. At the hearing, the court explained that once Ms. G. established a "better track record" of attending those visits, "maybe we can then branch

-25-

out and try to have something with Andre and his mother[.]"

**CONCLUSION**

The circuit court was not required to continue to pursue reunification with Andre's mother in Washington, where there was no likelihood that Andre would be safe and healthy in the mother's home within the time that he would remain under the court's jurisdiction, and where Andre's emotional connections to his mother had been weakened over many years in part by his mother's inconsistent participation in visitation. The court did not abuse its discretion in determining that it was in Andre's best interests to change his permanency plan. *See In re Shirley B.*, 419 Md. at 7; *Cadence B.*, 417 Md. at 163-64.

**APPELLEE'S MOTION TO DISMISS DENIED. ORDER OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**